STATE OF NORTH CAROLINA v. PAUL WAYNE WHITLEY

No. 564A83

(Filed 28 August 1984)

**1. Criminal Law § 32.1— testimony about "crime scene"—no violation of presumption of innocence**

An officer's references to the "crime scene" in his testimony did not deprive defendant of the presumption of innocence and were not prejudicial since the term "crime scene" is neutral as to whom criminal conduct is attributable. Furthermore, defendant waived his right to raise on appeal his objection to such evidence where references to the "crime scene" were admitted without objection both before and after defendant's objection.

**2. Criminal Law § 73.2— statements by another—admissibility to explain subsequent conduct**

Testimony by decedent's wife that decedent had told her to go inside the house and to lock the door when they got home was not inadmissible hearsay, since it was not offered to prove the truth of the matter asserted, and was admissible to explain the wife's subsequent conduct in going inside the house and locking the door as requested by decedent.

**3. Criminal Law § 89.4— prior inconsistent statement—admissibility for impeachment**

The pretrial statement of a defense witness was properly admitted on rebuttal for impeachment purposes where the prior statement was inconsistent in part with the trial testimony of the witness and was material in that it related to events immediately leading to the shooting in this case.

**4. Criminal Law § 95.1— evidence competent for restricted purpose—failure to request limiting instruction**

The admission without limitation of evidence which is competent for a restricted purpose will not be held to be error in the absence of a request by the defendant for limiting instructions.

**5. Homicide § 21.5 — first degree murder — sufficiency of evidence**

There was substantial evidence that defendant unlawfully killed his son with premeditation and deliberation so as to support his conviction of first degree murder where the evidence tended to show that defendant and his son quarreled at the mother's home during which defendant threatened to kill the son; the son left his mother's home and went to his home several hundred yards away where he pulled his truck sideways into his driveway; defendant followed his son, and when he arrived at his son's house, the son fired a shot into the air above his father's truck; several seconds later the son's wife heard three shots in rapid succession; the son had been shot three times with bullets from a pistol the defendant admitted firing; and two shots which were consistent with distant shots had been fired into the son's back.

**6. Homicide §§ 30.2, 32.1 — first degree murder — failure to submit voluntary manslaughter**

The trial court in a first degree murder case did not err in refusing to submit involuntary manslaughter as a possible verdict where defendant did not claim that his gun discharged accidentally but relied upon a theory of self-defense, stating that he shot decedent to save his own life. Furthermore, the jury verdict of guilty of first degree murder rendered harmless the failure to submit a possible verdict of manslaughter.

BEFORE *Freeman, Judge,* at the September 19, 1983 Criminal Session of Superior Court, WILKES County, the defendant was tried and convicted of murder in the first degree. The trial court sentenced him to life imprisonment and he appealed to the Supreme Court pursuant to G.S. 7A-27(a). Heard in the Supreme Court on March 14, 1984.

*Rufus L. Edmisten, Attorney General, by Donald W. Stephens, Assistant Attorney General, for the State.*

*E. James Moore, for the defendant appellant.*

MITCHELL, Justice.

The defendant seeks a reversal of his conviction of first degree murder, contending that the trial court erred in submitting a possible verdict of first degree murder to the jury and in failing to find the guilty verdict contrary to the weight of the evidence. He also contends that the trial court erroneously allowed certain testimony to be admitted. He finally assigns as error the trial court's refusal to instruct the jury on involuntary manslaughter as a possible verdict. Having examined the evidence presented, we find no merit in the defendant's contentions.

The State's evidence tended to show that the deceased, Billy Joe Whitley, lived with his wife and young son in a house located about two hundred yards from the home of his mother, Betty Whitley. Betty Whitley and the father of the deceased, the defendant Paul Whitley, had been separated for several months when the death of Billy Joe Whitley occurred in May, 1983. On May 7, 1983 at approximately 6:00 p.m. Billy Joe Whitley, his wife Theresa and his son Joey rode in a red pickup truck to Betty Whitley's house to pick up mail. Billy Joe Whitley went inside the house.

Theresa Whitley testified that shortly after her husband went inside his mother's home, she heard the raised voices of her husband and his father, the defendant, in argument. She heard the defendant say "Joe, I'm gonna come up there and kill you." She heard her husband say, "Daddy, don't come up there and bother us anymore." Theresa Whitley testified that Billy Joe Whitley came back outside, got into the truck and started driving home. He told his wife to get out her house key and to go inside their home and lock the door. When they arrived home, her husband pulled the red pickup truck sideways across their driveway. Billy Joe Whitley then got his shotgun and some shells from the house. Theresa Whitley went inside the house with her son and locked the door. She watched as the defendant drove up in an El Camino truck and pulled into the driveway. Theresa Whitley observed her husband fire a shot into the air over the defendant's truck. She looked around to locate her young son, and then heard two or three more shots in rapid succession. She ran outside and saw her husband, who had blood on him, getting up from the ground. Her husband walked toward his father's El Camino and said, "Daddy, you shot me. I'm bleeding, take me to the hospital." He then got into the El Camino with his father. The defendant drove his son to a hospital.

Further evidence presented by the State tended to show that the deceased suffered three gunshot wounds. One wound was a grazing wound to the right arm. One wound was to the right back, eleven inches from the top of the deceased's head. The third wound was to the right lower back, fifteen to sixteen inches below the top of the head. The wounds were consistent with having been caused by distant shots.

Two witnesses for the State testified to their observations of the defendant at Wilkes County General Hospital. They observed the defendant bring his son to the door of the hospital and heard him say, "I think he's been shot." After two men helped Billy Joe Whitley inside the hospital emergency room, the defendant left without reentering the emergency room. The defendant was not arrested until May 16, 1983, although a warrant was issued May 7, 1983 and a search for him conducted throughout the county.

The evidence presented by the defendant included his own testimony concerning the events of May 7, 1983. The defendant testified that he was at his home that day and that although he did not stay with his wife all of the time, he and his wife did live together. He acknowledged having an argument with his son over money he said Billy Joe owed him. He testified that he did not threaten his son, but told him that he wanted to talk with him further.

The defendant stated that Billy Joe left in his truck and that he, the defendant, followed his son in an El Camino truck to his son's house. He testified that when he arrived at the house, Billy Joe had blocked the driveway with his truck. Billy Joe walked from behind the truck, fired a shotgun above the El Camino, and immediately began reloading his gun. He walked toward the defendant's El Camino and said, "Dad, do you believe I'll kill you?" The defendant answered, "Billy Joe, I hope not." Billy Joe then put the shotgun in the window of the El Camino and hit his father several times with the barrel. The defendant was knocked down onto the seat by the blows and while he was down, he reached under the seat for his pistol. The defendant's testimony was that as he came back up from the floor, his son backed off. The defendant fired three shots at his son to save his own life. He then drove Billy Joe to the hospital. After leaving the hospital, he saw several friends. He then spent four days in a hay barn thinking, after which he went home, sent for a minister, and surrendered to police. The defendant acknowledged that prior to May 7, 1983 he had lived with a twenty-three year old woman, Penny Whitley [unrelated], in a house across the road from the house occupied by his wife.

Several witnesses testified on behalf of the defendant. Several of his friends testified that they had seen the defendant on

the night after the shooting. At that time he was bruised about the head and shoulders. They testified that the defendant had told them that his son had hit him with the barrel of a gun.

Betty Whitley, the defendant's wife, testified on his behalf that she remembered an argument over money between her husband and her son on May 7, 1983. She recalled no threats, but stated that she went after her husband when he followed their son to their son's house. She testified that her husband told her to go back home because he did not intend any trouble. She testified that she and her husband had been separated for several months, but that he spent most days and some nights with her.

Detective David Call testified that Betty Whitley had made several statements to the police after the death of her son. She told them that on May 7, 1983 her husband had been in a very bad mood, and that after the argument over money, she ran out to the road to stop her husband because she thought there would be trouble.

I.

[1] The defendant first contends that the trial court erred in admitting over objection references by Detective Call to the "crime scene" in his testimony about his investigation of the shooting. The defendant maintains that the references deprived him of a fair trial by violating the requirement that the State prove every element of a crime and by depriving him of the presumption of innocence.

The defendant raised no objection at trial to the first reference to "crime scene." He made a general objection to the "terminology 'crime scene' " at the second reference by Detective Call, and the trial court overruled the objection. The detective made three further references to the crime scene in his testimony to which no objection was raised.

We are not persuaded by the defendant's argument that the references to the "crime scene" were prejudicial. It is clear that some sort of crime was committed at the residence of Billy Joe Whitley on May 7, 1983. Several gunshots were fired which caused the death of Billy Joe Whitley. At the very least, an unlawful affray occurred at the scene. The phrase "crime scene" does not suggest whose conduct was criminal, however, and did

not relieve the State's burden of proving that a crime had been committed and that it was committed by the defendant. Because the term "crime scene" is neutral as to whom criminal conduct is attributable, the defendant was not deprived of the presumption of innocence.

Furthermore, the defendant waived his right to raise on appeal his objection to the evidence. Where evidence is admitted over objection, and the same evidence has been previously admitted or is later admitted without objection, the benefit of the objection is lost. *State v. Maccia*, 311 N.C. 222, 316 S.E. 2d 241 (1984); *State v. Chapman*, 294 N.C. 407, 241 S.E. 2d 667 (1978); 1 Brandis on North Carolina Evidence § 30 (1982). Reference to the "crime scene" was admitted without objection both before and after the defendant's objection. We overrule this assignment of error.

## II.

[2]　The defendant next contends that the trial court erred in admitting the testimony of Theresa Whitley concerning statements made by her husband before his death. She testified over objection that on the way to their home after the argument between the defendant and her husband, her husband asked her if she had a house key. She said she told him "yes." Theresa Whitley testified that her husband told her to go inside the house and to lock the door when they got home. The defendant contends that the testimony was inadmissible hearsay. We hold that the testimony was properly allowed.

Hearsay is defined in our cases as the assertion of any person other than that of the witness himself in his present testimony offered to prove the truth of the matter asserted. 1 Brandis on North Carolina Evidence § 138 (1982). Although the statement of Billy Joe was the assertion of someone other than the witness Theresa Whitley in her testimony, it was not offered to prove the truth of the matter asserted. Instead, the evidence was offered to explain Theresa's subsequent conduct in going inside the house and locking the door as requested by her husband. This Court has long held admissible statements by a declarant other than the witness for the purpose of explaining subsequent conduct. *State v. Maynard*, 311 N.C. 1, 316 S.E. 2d 197 (1984); *State v. White*, 298 N.C. 430, 259 S.E. 2d 281 (1979); *State v. Potter*, 295 N.C. 126, 244

S.E. 2d 397 (1978); *State v. Irick*, 291 N.C. 480, 231 S.E. 2d 833 (1977). We find this assignment of error to be meritless.

III.

[3] The defendant argues in his next assignment of error that the trial court erred in admitting a pretrial statement of Betty Whitley. The defendant's contention is that the matters referred to in the statement were collateral and not properly subject to proof by extrinsic evidence. He further argues that the trial court should have given a limiting instruction to the jury.

On direct examination, the witness testified about events leading up to the shooting. She testified that an argument had occurred between her husband and her son. After her husband left the house, she walked down the road after him. She testified that she did not know why she followed her husband. Her testimony was that her husband told her to go back because he was not going for any trouble. She stated that she and her husband had been separated for several months at the time of the shooting but that he had returned home.

On cross examination the witness did not remember stating to police officers that her husband was in a bad mood on the day of the shooting. She stated that he was not in a bad mood. She further stated that she did not remember telling officers that her husband had said to her son during the argument, "I'll show you." The prosecutor questioned her about her statement to officers that she ran rather than walked to Billy Joe's house. She did not remember making the statement and denied making it. She did not remember telling officers that she ran to Billy Joe's house because she thought there would be trouble.

As part of its rebuttal evidence, the State called Detective Call, and the trial court permitted Call to read from a prior statement made by the witness. It conflicted in some ways with her trial testimony. In her statement to the officers she said that the defendant had been in a bad mood on the day of the shooting and had told her son, "I'll show you," during the argument. She also said that she ran to Billy Joe's house because she thought there would be trouble.

State v. Whitley

The trial court did not err in permitting the State to offer the prior statement of the witness Betty Whitley. Under certain circumstances a witness may be impeached by proof of prior conduct or statements which are inconsistent with the witness's testimony. 1 Brandis on North Carolina Evidence § 46 (1982). Inconsistent prior statements are admissible for the purpose of shedding light on a witness's credibility. *Id.*

When the witness's prior statement relates to material facts in the witness's testimony, extrinsic evidence may be used to prove the prior inconsistent statement without calling the inconsistencies to the attention of the witness. *State v. Green*, 296 N.C. 183, 250 S.E. 2d 197 (1978). Material facts involve those matters which are pertinent and material to the pending inquiry. *Id.* When the prior statement of the witness is collateral but tends to show bias, it must be called to the witness's attention but may be proved by extrinsic evidence. *Id.* If the prior statement of the witness is collateral and does not tend to show bias, the cross examiner is bound by the answer of the witness on cross examination. No other witness may be called to prove the prior inconsistent statement. *Id.* Because the prior statement with which Betty Whitley was impeached was inconsistent in part with her testimony and material in that it related to events immediately leading to the shooting in this case, we hold that the trial court committed no error in allowing the testimony of Detective Call on rebuttal.

The defendant contends in particular that evidence concerning Betty Whitley's separation from her husband was collateral and that the prosecutor should have been bound by her answers upon cross examination. Having examined both the testimony and the prior statement of the witness offered on rebuttal, we find that the part of the statement concerning the marital relations of the Whitleys was not inconsistent but instead was corroborative of Betty Whitley's direct testimony.

On direct examination the witness testified that the defendant was living with her and that he had never been away for long. It was revealed on cross examination that the couple had been separated for seven months and that the defendant had lived with Penny Whitley. The prior statement of the witness which Detective Call read to the jury also stated that the couple had been

separated for several months. Since the testimony about the separation had already been admitted into evidence without objection, repetition of the evidence was cumulative and clearly not prejudicial. If such corroborative testimony did relate to collateral matters, the defendant has not demonstrated a reasonable possibility that a different result would have been reached at the trial had the prior statement concerning the marital status of the couple not been introduced. *See* G.S. 15A-1443(a). The trial court did not commit prejudicial error in admitting extrinsic evidence of Betty Whitley's prior statement, and the defendant's assignment of error is overruled.

[4] The defendant also complains that the trial court did not instruct the jury to consider the prior statement for the sole purpose of evaluating Betty Whitley's credibility. It does not appear from the record that the defendant requested such an instruction. The admission without limitation of evidence which is competent for a restricted purpose will not be held to be error in the absence of a request by the defendant for limiting instructions. *State v. Maccia*, 311 N.C. 222, 316 S.E. 2d 241 (1984); *State v. Montgomery*, 291 N.C. 91, 229 S.E. 2d 572 (1976). We overrule this assignment of error.

IV.

The defendant has raised four additional issues on appeal for which there is one dispositive inquiry: was there sufficient evidence of first degree murder to submit to the jury? The defendant contends the trial court erred (1) in denying his motion to dismiss the charges at the end of all of the evidence, (2) in instructing the jury on first degree murder as a possible verdict, (3) in entering judgment for first degree murder, and (4) in denying the defendant's motion for appropriate relief for insufficiency of evidence. If there was sufficient evidence of first degree murder to submit to the jury and to withstand a motion to dismiss, the trial court properly instructed the jury on first degree murder and entered judgment.

In deciding whether the trial court erred in denying a motion to dismiss, the question is whether substantial evidence was introduced of each essential element of the offense charged or a lesser offense included therein and of the defendant's having been the perpetrator. If so, the motion is properly denied. *State v.*

*Powell*, 299 N.C. 95, 261 S.E. 2d 114 (1980). The evidence must be considered in the light most favorable to the State, and the State is entitled to every reasonable intendment and every reasonable inference to be drawn therefrom. If the trial court determines that a reasonable inference of the defendant's guilt can be drawn from the evidence, then the defendant's motion to dismiss must be denied and the case must be submitted to the jury. *State v. Bright*, 301 N.C. 243, 271 S.E. 2d 368 (1980). Contradictions and discrepancies are matters for the jury to resolve. *State v. Bolin*, 281 N.C. 415, 189 S.E. 2d 235 (1972).

Murder in the first degree is a murder "which shall be perpetrated by means of poison, lying in wait, imprisonment, starving, torture or by any other kind of premeditated killing." G.S. 14-17. Premeditation and deliberation are essential elements of murder in the first degree. Premeditation means thought beforehand for some period of time, however short. *State v. Lowery*, 309 N.C. 763, 768, 309 S.E. 2d 232, 237 (1983). Deliberation means intention to kill, executed by the defendant in a cool state of blood, in furtherance of a fixed design to gratify a feeling of revenge or to accomplish some unlawful purpose and not under the influence of violent passion suddenly aroused by some just or lawful cause or legal provocation. *Id.* The defendant need not be calm and tranquil to satisfy the requirement of a cool state of blood. *State v. Myers*, 299 N.C. 671, 263 S.E. 2d 768 (1980). If done pursuant to a fixed design to kill, an unlawful killing may be deliberate and premeditated "notwithstanding that defendant was angry or in an emotional state at the time, unless such anger or emotion was such as to disturb the faculties and reason." *Id.* at 677, 263 S.E. 2d at 772-73.

[5] Guided by these principles, we hold that there was substantial evidence that the defendant in this case unlawfully killed his son with premeditation and deliberation. When considered in the light most favorable to the State, the evidence showed a quarrel between the defendant and his son during which one witness heard the defendant say, "Joe, I'm gonna come up there and kill you." The son responded, "Daddy, don't come up there and bother us anymore." The deceased left his mother's house and went to his home several hundred yards away where he pulled his truck sideways into his driveway. The defendant followed his son. When he arrived at his son's house the deceased fired a shot into

the air above his father's truck. Several seconds later the defendant's daughter-in-law heard three shots in rapid succession. The deceased had been shot three times with bullets from a pistol the defendant admitted firing. Two shots were fired into the decedent's back and were consistent with distant shots.

The evidence that the defendant threatened to kill his son and then drove to his son's house where he shot him three times, twice in the back, is substantial evidence from which the jury properly could have found a premeditated and deliberate murder. The trial court did not err in denying the defendant's motion for dismissal for insufficiency of evidence. The trial court properly instructed the jury that it could find the defendant guilty of first degree murder and entered judgment accordingly.

## V.

The defendant also contends that the trial court erred when it denied his motion to set aside the jury verdict as contrary to the weight of the evidence. Such a motion is addressed to the sound discretion of the trial court and is not reviewable in the absence of manifest abuse of discretion. *State v. Jones*, 310 N.C. 716, 314 S.E. 2d 529 (1984); *State v. Witherspoon*, 293 N.C. 321, 237 S.E. 2d 822 (1977). We believe the trial court acted within its sound discretion when it refused to set aside the jury verdict as contrary to the weight of the evidence, and we overrule this assignment of error.

## VI.

[6] The defendant in his final assignment of error contends the trial court erred in its charge to the jury when it refused to submit a possible verdict of involuntary manslaughter. The defendant contends that the facts of this case could support the finding of an unintentional homicide resulting from the reckless use of a deadly weapon. In support of his argument, he points to his testimony in response to a question as to what he saw at the moment he fired his gun. He stated, "I saw [the son's] shotgun more than anything else . . . . The shotgun was the main thing I saw. I mean, I probably saw him, too, but the shotgun was really what I saw." We find no merit in this argument.

The defendant was not entitled to an instruction on involuntary manslaughter. The necessity for instructing a jury as to a

lesser included offense arises only when there is evidence from which a jury could find such an included crime was committed. *State v. Ward*, 286 N.C. 304, 210 S.E. 2d 407 (1974), *death sentence vacated*, 428 U.S. 903 (1976). Involuntary manslaughter is the unlawful killing of a human being, unintentionally and without malice, proximately resulting from the commission of an unlawful act not amounting to a felony nor naturally dangerous to human life, or resulting from a culpably negligent act or omission. *State v. Redfern*, 291 N.C. 319, 230 S.E. 2d 152 (1976). There is no evidence from which a jury could find that involuntary manslaughter was committed in this case. The defendant did not claim that his gun discharged accidentally. Instead, he relied upon a theory of self-defense, stating that he shot his son to save his own life. Further, even had the trial court's refusal to submit a possible verdict of involuntary manslaughter been error, the jury verdict of guilty of first degree murder rendered harmless the failure to submit a possible verdict of manslaughter. *State v. Bush*, 307 N.C. 152, 297 S.E. 2d 563 (1982).

We hold that the defendant received a fair trial free of prejudicial error.

No error.