An unpublished opinion of the North Carolina Court of Appeals does not constitute controlling legal authority. Citation is disfavored, but may be permitted in accordance with the provisions of Rule 30(e)(3) of the North Carolina Rules of A p p e l l a t e     P r o c e d u r e .

NO. COA13-606

NORTH CAROLINA COURT OF APPEALS

Filed:  18 February 2014

STATE OF NORTH CAROLINA

v.                                    Johnston County
                                      No. 10 CRS 057347
STEFAN ANTHONY GUDAC


Appeal by defendant from judgment entered 23 August 2012 by Judge James F. Ammons, Jr. in Johnston County Superior Court. Heard in the Court of Appeals 23 October 2013.

> *Attorney General Roy Cooper, by Special Deputy Attorney General Robert M. Curran, for the State.*

> *Appellate Defender Staples S. Hughes, by Assistant Appellate Defender Katherine Jane Allen, for defendant-appellant.*


McCULLOUGH, Judge.


Defendant Stefan Anthony Gudac appeals from a conviction of voluntary manslaughter.  Based on the following reasons, we hold no error as to defendant's conviction.  We vacate the trial

court's restitution award for lack of supporting evidence and remand for further proceedings.

## I.   Background

The State's evidence tended to show that on the evening of 26 November 2010, defendant held a party at his residence in Pine Level, North Carolina.  Several people attended the party, including Allison Sherrod, Devin Barber, Adam Sutton, and Lawrence Mangaro.

Sherrod, who was defendant's cousin, had previously dated Barber from 2006 to 2008.  Sherrod testified that during the party, she and Barber had a private conversation outside of the residence in which Barber stated that he still loved her.  While Sherrod and Barber were talking, defendant "looked mad" and urged them to be quiet or to return inside.

Mangaro testified that defendant was mad about the fact that Barber and Sherrod were talking.  Defendant expressed to Mangaro that "he wished that they would, you know, quit and come inside with the rest of everybody."  Mangaro opened the door and defendant's dog ran out of the house.  Defendant asked Mangaro to help him find his dog and while searching, defendant stated twice, "this is really pissing me off, I want to shoot

[Barber]." Defendant and Mangaro returned to the house without finding the dog.

Some of the guests left the party, leaving only Mangaro, Sutton, defendant, Barber, and Sherrod at defendant's residence. Mangaro noticed that Sherrod and Barber were outside, sitting in Sherrod's vehicle.

Sherrod testified that she became upset and began crying while talking with Barber about their past relationship. Defendant came out of the house and walked towards Sherrod's vehicle. Defendant walked to the passenger's side of Sherrod's vehicle, where Barber was sitting, and told Barber to get out of the vehicle and to come inside the residence. Barber exited the vehicle and told Sherrod to go to his mother's house where he would meet her in fifteen minutes.

At this point, Sherrod left defendant's residence. Mangaro testified that Barber tried to leave and asked defendant where his keys were. "[Defendant] told him that he wasn't going anywhere. That he had been drinking and he doesn't need to drive." Barber started to enter defendant's residence in search of his keys when defendant stated "[y]ou're not going to find your keys because your dumb*** doesn't read books and I hid them on my bookshelf behind a book."

Mangaro testified that Barber came back out of the residence. Defendant and Barber were standing in defendant's carport when defendant stated, "[y]ou need to go home. You know, I want you – I want you gone." Barber started approaching defendant and defendant said, "don't you make me get violent." Defendant pushed Barber. Immediately thereafter, Mangaro heard gunshots and saw multiple blasts of a pistol. Barber said "[y]ou shot me. You shot me" and fell to the ground in front of where defendant was standing. Mangaro ran inside the house and defendant followed him inside. Mangaro grabbed the phone, threw it at defendant, and directed him to call 911.

Officer Andrew Davis of the Pine Level Police Department testified that after receiving a call at approximately 1:24 a.m. on 27 November 2010, he arrived at defendant's residence. When Officer Davis asked defendant who had shot Barber, defendant stated, "I did. He wouldn't leave, so I shot him."

Russell Clawson, a 911 operator for Johnston County, testified that he received a call from defendant at 1:22 a.m. on 27 November 2010. Defendant told Clawson that he put his hands on Barber, Barber wouldn't leave, so he shot him.

Defendant was transferred to Johnston Memorial Hospital and pronounced dead. Dr. Jonathan Privette, the associate chief

medical examiner at the Office of the Chief Medical Examiner in Chapel Hill, North Carolina testified that he performed an autopsy on Barber. Barber's blood alcohol content was at 0.21 percent. Barber had suffered three gunshot wounds; one to his right chest, one to his left upper abdomen, and one to his left upper thigh. The shot to his chest was the fatal wound.

Defendant testified in his own defense. On 26 November 2010, defendant decided to have a party with several guests. Among the guests was Barber, whom defendant had known for eight years and considered his best friend. After arriving at the party, Barber gave his keys to defendant to "just put them up somewhere so he wouldn't drive home[.]" Defendant placed Barber's keys on a bookshelf in his room. Guests started leaving the party at around 10:00 p.m.

Defendant went outside and noticed Barber and Sherrod talking to one another. Sherrod seemed to be crying while Barber was talking loudly. Defendant testified that Barber told him to go inside. While defendant was coming back into the house, he ran into Mangaro on the porch and expressed concern that Sherrod and Barber were talking. Thereafter, Sherrod entered defendant's home, noticeably upset and crying. Barber seemed angry and yelled at Sherrod.

Mangaro suggested to defendant that he ask Barber to leave but defendant testified that he "[did not] want to do that because I don't want to start a fight with him. I don't want any trouble with him, you know. I don't – I said like I don't want to shoot him or anything."

At that time, Mangaro opened the front door and defendant's dog ran out of the house. Before going outside to search for his dog with the assistance of Mangaro, defendant testified that he went into his room to get his pistol because he was afraid his dog might get attacked by coyotes. Defendant placed the gun in the pocket of his shorts and went outside. After searching unsuccessfully for a period of time, they returned to the house.

Defendant heard someone crying, went to the carport, and saw that the crying was coming from Sherrod's car. Defendant approached Sherrod's car and knocked on her window. Defendant told Barber that he needed to leave. Barber got out of the car, yelled at Sherrod, and told her to meet him at his house in fifteen minutes. Sherrod left the scene.

Defendant testified that Barber slammed Sherrod's car door and "started coming at me." Defendant told Barber to stop and that "[i]f you love us, just please don't get violent, but you need to leave." Barber stopped and started walking towards the

carport. Once he got near the door of the house, Barber turned around and asked defendant about his keys. Defendant told him that they were in a bookcase in his room and Barber started "coming at" defendant. Barber pushed defendant. Defendant remembered the gun in his pocket and thought he needed to find a way to get rid of the gun.

Defendant testified that the gun came out of his pocket and that he wanted to throw it to the side in order to get rid of it when he felt it turn towards him. Defendant "freaked out" and thought Barber was going to kill him. Defendant testified that "I mean, I fired it. I don't know. He scared me so bad. I thought I was going to die." Barber stopped attacking defendant, stood back, and laid down. Defendant then ran inside to call the police. In his closing argument, defense counsel argued that defendant acted in self-defense.

On 13 December 2010, defendant was indicted for first-degree murder. On 23 August 2012, a jury found defendant guilty of voluntary manslaughter.

The trial court found defendant's prior record level to be Level I and defendant was sentenced to a term of sixty-four (64) to eighty-six (86) months imprisonment. Defendant was ordered to pay $3,014.50 in costs and $10,000.00 in restitution as a

civil judgment against defendant. The trial court recommended psychiatric and/or psychological counseling, that work release should not be granted, and payment as a condition of post-release supervision or from work release earnings.

Defendant appeals.

## II. Discussion

On appeal, defendant argues that the trial court erred by (A) failing to submit the verdict of involuntary manslaughter to the jury; (B) incorrectly submitting the instruction on voluntary manslaughter to the jury; (C) admitting evidence of the victim's good character through the admission of testimony and a picture; (D) admitting photographs of the deceased victim; (E) admitting evidence of firearms found in defendant's residence which were unrelated to the commission of the crime; and (F) ordering restitution where there was insufficient evidence to support the restitution amount.

### A. Involuntary Manslaughter Instruction

Defendant first argues that the trial court erred by failing to submit the verdict of involuntary manslaughter to the jury where the evidence supported this lesser-included offense instruction.

> [A] lesser included offense instruction
> is required if the evidence would permit a

> jury rationally to find [defendant] guilty of the lesser offense and acquit him of the greater. The test is whether there is the presence, or absence, of any evidence in the record which might convince a rational trier of fact to convict the defendant of a less grievous offense.

*State v. Millsaps*, 356 N.C. 556, 562, 572 S.E.2d 767, 772 (2002) (citations and quotation marks omitted). "Where the State's evidence is positive as to each element of the offense charged and there is no contradictory evidence relating to any element, no instruction on a lesser included offense is required." *State v. Thomas*, 325 N.C. 583, 594, 386 S.E.2d 555, 561 (1989) (citation omitted).

Involuntary manslaughter is defined as "the unintentional killing of a human being without malice, proximately caused by (1) an unlawful act not amounting to a felony nor naturally dangerous to human life, or (2) a culpably negligent act or omission." *State v. Hudson*, 345 N.C. 729, 731-32, 483 S.E.2d 436, 438 (1997) (citations omitted).

Defendant argues that there was evidence that the killing of Barber was unintentional and relies on the holding in *State v. Buck*, 310 N.C. 602, 313 S.E.2d 550 (1984). In *Buck*, the defendant and the victim got into a disagreement. There were two conflicting accounts of the victim's death. The victim's

girlfriend's testimony indicated that the defendant picked up a butcher knife off the kitchen counter and advanced on the unarmed victim. The defendant stabbed the victim in the face, tripped him, and stabbed him several times while the victim was lying on the floor. *Id.* at 603, 313 S.E.2d at 551. The defendant's account of the incident suggested that the victim, with an open pocketknife in his hand, came from the upstairs of the apartment to where the defendant was standing in the kitchen. The victim was acting abusively and threatening to kill his girlfriend. The defendant became scared and tried to discourage the victim from hurting his girlfriend, however, the victim came towards the defendant brandishing the open pocketknife. The defendant grabbed a butcher knife off of the kitchen counter and a struggle ensued, with each of the men holding a knife. The defendant testified that he threw the victim to the floor and fell on top of him. Defendant said, "When I fell down the [butcher] knife was in my hand. I must have fell [sic] on top of the knife because when I fell down I noticed the knife had wounded" the victim. *Id.* The *Buck* Court held that the evidence "could support a verdict of involuntary manslaughter on the theory that the killing [of the victim] was

the result of [the defendant's] reckless, but unintentional use of the butcher knife."  *Id.* at 606, 313 S.E.2d at 553.

In the case *sub judice*, a review of the record establishes that defendant never testified that he did not intend to pull the trigger of his gun or that his gun discharged accidentally. In fact, defendant testified to the following:

> [Defense Counsel:]  What happened?
>
> [Defendant:]  I mean, I fired it.  I don't know.  He scared me so bad.  I thought I was going to die.
>
> [Defense Counsel:]  Why did you fire?
>
> [Defendant:]  I mean, that's what you're trained to do.  In every type of training I've had, you got to – if there's immediate threat, you got to – I don't know.

Therefore, defendant's own testimony establishes that he intended to discharge his weapon, distinguishing the instant case from *Buck*.

Furthermore, defendant relied upon a theory of self-defense, arguing that he fired his gun at Barber to protect himself.  In *State v. Whitley*, 311 N.C. 656, 319 S.E.2d 584 (1984), the defendant argued that the trial court erred by failing to give an instruction to the jury on involuntary manslaughter.  The *Whitley* Court held that there was no evidence from which a jury could find that involuntary manslaughter was

committed in the case because the defendant did not claim that his gun, killing his son, was discharged accidentally. "Instead, [the defendant] relied upon a theory of self-defense, stating that he shot his son to save his own life." *Id.* at 667, 319 S.E.2d at 591. Similarly, we reject defendant's arguments that there was evidence from which a jury could find that he committed involuntary manslaughter and hold that the trial court did not err by denying defendant's request to submit the verdict of involuntary manslaughter.

## B.   Voluntary Manslaughter Instruction

Next, defendant argues that the trial court erred in its instruction on voluntary manslaughter by instructing the jury that defendant was not entitled to the benefit of self-defense if he was the aggressor, leaving the determination of who was the aggressor to the jury. Defendant contends that the challenged jury instructions were not supported by the evidence and asserts that there was "absolutely no evidence" defendant was the aggressor. We disagree.

"[Arguments] challenging the trial court's decisions regarding jury instructions are reviewed *de novo*, by this Court." *State v. Osorio*, 196 N.C. App. 458, 466, 675 S.E.2d 144, 149 (2009) (citation omitted). "A defendant is prejudiced

when there is a reasonable possibility that, had the error not been committed, a different result would have been reached at trial. The burden of showing such prejudice is on defendant." *State v. McLean*, 205 N.C. App. 247, 252, 695 S.E.2d 813, 817 (2010) (citations omitted).

Defendant relies on our holdings in *State v. Vaughn*, __ N.C. App. __, 742 S.E.2d 276 (2013), and *State v. Jenkins*, 202 N.C. App. 291, 688 S.E.2d 101 (2010), to support his contentions. After a thorough review, we hold that neither of these cases are controlling in the case *sub judice*.

In *Vaughn*, our Court held that "where the evidence does not indicate that the defendant was the aggressor, the trial court should not instruct on that element of self-defense." *Vaughn*, __ N.C. App. at __, 742 S.E.2d at 278 (citation omitted). *Vaughn* is distinguishable from our present case because although the *Vaughn* defendant armed herself with a knife, believing she and her friend were in danger from the victim, the evidence demonstrated that the victim lunged at the defendant before the defendant was able to initiate any action. *Id.* at __, 742 S.E.2d at 280. In the present case, however, a State's witness, Mangaro, testified that while defendant and Barber were standing in defendant's carport, Barber began approaching defendant and

defendant said "don't you make me get violent." As Barber got closer to defendant, defendant pushed Barber and thereafter shot him.

In *Jenkins*, there was no evidence presented that the defendant was the aggressor during a fight with the victim that resulted in the shooting death of the victim. Our Court held that where there was no evidence that the defendant was the aggressor, "it was error . . . to instruct the jury that [the d]efendant could not avail himself of the benefit of self-defense." *Jenkins*, 202 N.C. App. at 299, 688 S.E.2d at 106. In the present case, however, there were conflicting accounts on who was the aggressor. Although Mangaro testified that defendant pushed Barber, defendant testified that it was Barber that approached defendant and pushed him.

Based on the foregoing, we hold that the facts of the case *sub judice* are readily distinguishable from the cases relied upon by defendant and reject his arguments.

C.    Testimony about and Photographs of the Victim

In his third argument, defendant asserts that the trial court erred by admitting evidence regarding the victim's good character through the admission of (1) the victim's father's testimony regarding the types of activities the victim enjoyed;

(2) the State's exhibit 11 which was a picture of the victim in an Eagle Scout uniform; and (3) the victim's father's testimony regarding the State's exhibit 11. Defendant argues that the challenged evidence was irrelevant and inadmissible pursuant to Rule 401 and 402 of the North Carolina Rules of Evidence. Further, defendant argues that any substantive value of the evidence, even if relevant, was substantially outweighed by unfair prejudice and issue confusion in violation of Rule 403. We hold that defendant's arguments have no merit.

"We review a trial court's decision to admit or exclude evidence under Rule 403 for abuse of discretion." *State v. Locklear*, 363 N.C. 438, 448, 681 S.E.2d 293, 302 (2009).

> Although the trial court's rulings on relevancy technically are not discretionary and therefore are not reviewed under the abuse of discretion standard applicable to Rule 403, such rulings are given great deference on appeal. Because the trial court is better situated to evaluate whether a particular piece of evidence tends to make the existence of a fact of consequence more or less probable, the appropriate standard of review for a trial court's ruling on relevancy pursuant to Rule 401 is not as deferential as the "abuse of discretion" standard which applies to rulings made pursuant to Rule 403.

*Dunn v. Custer*, 162 N.C. App. 259, 266, 591 S.E.2d 11, 17 (2004) (citation and quotation marks omitted).

Relevant evidence is evidence "having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." N.C. Gen. Stat. § 8C-1, Rule 401 (2013). "All relevant evidence is admissible . . . . Evidence which is not relevant is not admissible." N.C. Gen. Stat. § 8C-1, Rule 402 (2013). Rule 403 states that "[a]lthough relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence." N.C. Gen. Stat. § 8C-1, Rule 403 (2013).

We note that the record reflects that defendant only objected to the introduction of the photograph, not to the testimony surrounding the photograph or activities the victim enjoyed. Accordingly, we will review challenges to the admitted testimony pursuant to plain error review since defendant failed to properly preserve this issue for appellate review. N.C. R. App. P. 10(a)(1) and (4) (2013).

> For error to constitute plain error, a defendant must demonstrate that a fundamental error occurred at trial. To show that an error was fundamental, a defendant

must establish prejudice that, after examination of the entire record, the error had a probable impact on the jury's finding that the defendant was guilty. Moreover, because plain error is to be applied cautiously and only in the exceptional case, the error will often be one that seriously affect[s] the fairness, integrity or public reputation of judicial proceedings[.]

*State v. Lawrence*, 365 N.C. 506, 518, 723 S.E.2d 326, 334 (2012) (citations and quotation marks omitted).

The State's exhibit 11 was a photograph taken in 2008 of the victim, wearing his Eagle Scout uniform with a sash and several merit badges. "[W]e have repeatedly held that showing photographs of victims made during their lives is not prejudicial error." *State v. Bishop*, 346 N.C. 365, 388, 488 S.E.2d 769, 781 (1997) (citations omitted). "Photographs are usually competent to be used by a witness to explain or illustrate anything that is competent for him to describe in words." *State v. Holden*, 321 N.C. 125, 140, 362 S.E.2d 513, 524 (1987) (citation omitted). "[P]hotographs used to illustrate a witness's testimony about a victim-relative's appearance and health prior to death have been held admissible." *State v. Hope*, 189 N.C. App. 309, 315, 657 S.E.2d 909, 912 (2008). Here, the purpose of the photograph was to illustrate the victim's father's testimony about his son's activities prior to his

death. Based on the foregoing, we find no merit in defendant's argument that the trial court erred by admitting this evidence.

Defendant also argues that the victim's father's testimony regarding the State's exhibit 11 and regarding the types of activities the victim enjoyed amounted to error. The victim's father testified that the victim was interested in "sports, skating, loved the water. Later on he was interested in music, had some buddies that had a band and he loved to go with them and he liked to shoot guns." In addition, the victim's father testified that the victim was an Eagle Scout and described some of the badges he was wearing in the photo. Even assuming *arguendo* that this testimony was prejudicial, considering the record evidence, we are unable to say that the challenged testimony had a probable impact on the jury's finding of defendant's guilt. Defendant's argument is overruled.

### D. Photographs of Barber Deceased

In his fourth argument, defendant contends that the trial court erred by admitting photographs of the victim's bloody clothing and a photograph of the deceased victim in the emergency room in violation of Rules 401 - 403 of the North Carolina Rules of Evidence. Specifically, defendant argues that

the photographs were grossly inflammatory and were used to inflame the jury. We disagree.

"In determining whether to admit photographic evidence, the trial court must weigh the probative value of the photographs against the danger of unfair prejudice to defendant [pursuant to Rule 403]." *State v. Blakeney*, 352 N.C. 287, 309, 531 S.E.2d 799, 816 (2000) (citations omitted).

State's exhibit 7 is a photograph of the deceased victim with gauze over his eyes and a tube in his mouth. It is well established that "[p]hotographs of a homicide victim may be introduced even if they are gory, gruesome, horrible or revolting, so long as they are used for illustrative purposes and so long as their excessive or repetitious use is not aimed solely at arousing the passions of the jury." *State v. Goode*, 350 N.C. 247, 258, 512 S.E.2d 414, 421 (1999) (citation omitted). This photograph was relevant as it depicted the type of medical treatment the victim received and illustrated the testimony of witnesses who administered the medical treatment to the victim. Marion Kenny Bass, a paramedic at Selma EMS, testified to the treatment he rendered to the victim on 27 November 2010. Bass testified that the State's exhibit 7 accurately represented how the victim appeared at Johnston

Memorial Center and that the photograph illustrated the fact that Bass placed an airway tube in the victim's mouth before he expired. Sandra Davey, a registered nurse in the Johnston Medical Center's Emergency Department, also used the State's exhibit 7 to illustrate the medical treatment the victim received at the hospital.

The State's exhibits 6 and 41 are photographs of the victim's bloody clothing in the street, cut off by paramedics from the victim's body upon arrival on the scene. Defendant failed to object to the admission of this evidence, and now urges our Court to conduct plain error review. Our Courts have held that "[b]loody clothing of a victim that is corroborative of the State's case, is illustrative of the testimony of a witness, or throws any light on the circumstances of the crime is relevant and admissible evidence at trial." *State v. Gaines*, 345 N.C. 647, 666, 483 S.E.2d 396, 407 (1997) (citation omitted). Here, the State's exhibit 6 illustrated the testimony of Bass who arrived at the scene of the crime. Bass testified that the photograph represented how he cut off the victim's shirt. The State's exhibit 41 illustrated the testimony of Joelynn Marie Stallings, a field agent with the North Carolina State Bureau of Investigation, who stated that the photograph

illustrated the shirt that she collected from the driveway of defendant's residence.

Defendant argues that it was plain error to admit exhibits 9, 9A, and 53, which are also photographs of the victim's bloody clothing, including jeans, a shirt, and underwear. These exhibits illustrated the testimony of registered nurse Davey, who described what clothes the victim had on when he arrived at the hospital, and Agent Stallings.

Because the contested photographs were used for illustrative purposes and because they shed light on the circumstances of the crime, we hold that they were relevant. Further, the probative value of the challenged photographs substantially outweighed the danger of unfair prejudice to defendant. Defendant's arguments that the trial committed error, including plain error, by admitting these photographs are rejected.

### E.  Firearms

In his fifth argument, defendant argues that the trial court erred by admitting evidence of firearms found in defendant's house that were unrelated to the commission of the crime. Specifically, defendant argues that the State's exhibits 42-45, 47, and 51 and testimony related to those exhibits

violated Rules 401 – 403 of the North Carolina Rules of Evidence.

Prior to trial, on 10 August 2012, defendant filed a motion in limine seeking to exclude the "[i]ntroduction of photographs of firearms located at the home." Defendant contended that the firearms in the photographs belonged to defendant's father and that introduction of this evidence would violate Rule 403. At the beginning of defendant's trial, the trial court deferred ruling on this motion.

Defendant then objected to the admission of the following exhibits when they were offered at trial: 42 – a picture of a doorway that leads into the storage closet underneath defendant's carport; 43 – a picture of the storage closet after the door was opened which displays a handgun and long rifles; 44 – a view of the storage closet, which contains long rifles and ammunition, while standing in the doorway; 45 – a picture of the storage closet which contains two stacked safes containing ammunition; 47 – a picture of the inside of a safe, which contains several long rifles and handguns, located on the right side of the storage closet; and 51 – a picture of a handgun in a holster found in the console of defendant's vehicle. The trial court admitted the challenged exhibits into evidence over

defendant's objection. Exhibits 45, 47, and 51 were prohibited from being shown to the jury.

We reiterate that evidence is relevant if it has "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." N.C.G.S. § 8C-1, Rule 401. After careful review, we find that the admission of exhibits 42, 43, 44, 45, 47, and 51 into evidence, as well as testimony related to the exhibits, did not go to prove the existence of any fact of consequence to the determination of defendant's guilt as they had no relation to the commission of the crime. Because this evidence was not relevant, we agree with defendant that the challenged exhibits and corresponding testimony should not have been admitted.

Nevertheless, we hold that this error was not prejudicial, particularly in view of the fact that evidence established that defendant used the firearm retrieved from his room in the commission of the crime. The firearm defendant identified as the one used on 26 November 2010, State's exhibit 21A, fired two bullets that matched the two bullets retrieved from the victim's body. We have held that "[e]ven if the admission of the [challenged evidence] was error, in order to reverse the trial

court, the appellant must establish the error was prejudicial." *State v. Bodden*, 190 N.C. App. 505, 510, 661 S.E.2d 23, 26 (2008) (citing N.C. Gen. Stat. § 15A-1443(a)). Accordingly, we conclude that the erroneous admission of this evidence was not prejudicial in light of the overwhelming evidence of defendant's guilt.

## F.   Restitution Order

Lastly, defendant contends, and the State concedes, that the trial court erred by ordering restitution in the amount of $10,000.00 where there was insufficient evidence to support this amount. We agree.

It is well established that "[t]he amount of restitution ordered by the trial court must be supported by competent evidence presented at trial or sentencing." *State v. Blount*, 209 N.C. App. 340, 347-48, 703 S.E.2d 921, 926-27 (2011) (citation omitted).

In the present case, the trial court ordered defendant to pay $10,000.00 in restitution to the victim's estate as a condition of work release and ordered that the restitution be a civil judgment against defendant. However, there was no evidence presented to support the amount of restitution ordered by the trial court. In addition, the 23 August 2012 Judgment

and Commitment form refers to an attached "Restitution Worksheet, Notice and Order (Initial Sentencing)" but no such worksheet is found in the record. Therefore, we vacate the trial court's restitution order and remand for rehearing on this issue.

No error in part; vacated and remanded in part.

Judges ELMORE and DAVIS concur.

Report per Rule 30(e).