BRYANT, Judge.
*830 Where there was sufficient evidence presented at trial that defendant was the aggressor, the trial court did not err in instructing the jury on the aggressor doctrine. Assuming arguendo the trial court erred in allowing the jury to review photographs of the deceased victim during jury deliberations over defendant's objection, this error was harmless where defendant has not established that he was prejudiced thereby. Lastly, where the prosecutor's closing argument was not so grossly improper as to render defendant's trial and conviction fundamentally unfair, the trial court did not err when it declined to intervene ex mero motu during the prosecutor's closing argument, and we find no prejudicial error in the judgment of the trial court.
*831 On 9 November 2011, defendant Willoughby Mumma was with his wife Amy Chapman at their home in Bryson City, North Carolina. Amy's twenty-year-old son, Christopher Robinson, who lived with Amy and defendant, came home around 5:30 p.m. that evening where he encountered defendant and Amy, drinking and taking pills.
At around 8:00 p.m., Amy drove to a store where she purchased six alcoholic beverages. She returned home within twenty to twenty-five minutes.
While Amy was gone, defendant and his friend, Dewayne Bradley, had the following conversation via text message:
8:11 p.m., defendant: "I'm goin 2 kil her."
8:11 p.m., defendant: "I'm goin 2 kil her."
8:12 p.m., Bradley: "Please don't."
8:13 p.m., defendant: "Im going 2 I cant take."
8:13 p.m., Bradley: "Man just walk down the road."
8:13 p.m., defendant: "Do you have ne lime?"
8:14 p.m., Bradley: "Noooooo, just chill."
8:15 p.m., defendant: "No im over it I can't take no more I luv u bro."
8:16 p.m., Bradley: "Please lessen to me"
8:17 p.m., defendant: "Im sorry I have 2"
8:20 p.m., Bradley: "Man ill come and get 2morr, my word"
8:21 p.m., defendant: "Line will get rid of the body"
Around 9:45 p.m., defendant and Amy began arguing over an alarm clock radio. Robinson went into the bedroom and told them to stop arguing. According to defendant, Amy was intoxicated and "got meaner as the night went on."
At 11:16 p.m., defendant called Bradley multiple times and repeatedly called Bradley into the early morning hours of 10 November 2011. At 11:52 p.m., defendant texted Bradley duplicate text messages stating, "I need u 2 call me now GD."
At 9:30 a.m. the next morning, Robinson woke up and walked past defendant sitting on the couch in the living room, texting on his cell phone. Robinson went into the bedroom to look for Amy and get a cigarette. Robinson saw blankets all over the bedroom floor and a quarter-sized spot of blood on the bed. Robinson initially thought Amy may have hit defendant; she would get angry when she drank, and he had seen *832 Amy hit defendant before. Defendant told Robinson to get out of the room. Robinson asked *218 where Amy was, and defendant told him she was at work. Defendant was pacing back and forth from the living room to the kitchen, acting "like things [were not] right."
Defendant told Robinson to get ready for school. Bradley and his wife arrived to pick up Robinson for school. Bradley went into the house while Robinson got in the car. Defendant showed Bradley Amy's body on the closet floor. Bradley left immediately, got in his car, and told his wife and Robinson to lock the car doors. Defendant tried to get in the car with them, but Bradley ordered him out of the car. As they drove away, defendant ran into the woods. Bradley told Robinson that his mother was dead. He pulled into a driveway down the street, called 911, and waited for the police to arrive.
Law enforcement responded to the 911 call and discovered Amy's body in the bedroom closet. At some point later that day, Jennifer Jones, Bradley's ex-girlfriend, sent defendant a text asking, "What did you do?" Defendant responded, "I kild her." Law enforcement officers located defendant down the road from the residence in a field containing briars, weeds, and tall grasses. He was taken into custody at 5:18 p.m. with scratches on his arms and legs.
When law enforcement interviewed defendant later that day, defendant stated that both he and Amy were drug addicts and that on the night of 9 November 2011, they had been drinking and had also taken about thirty Klonopin pills each. Defendant stated that Amy tried to stab him with his pocketknife, at which point he took the knife from her, pushed her to the floor, sat on top of her, and stabbed her in the neck because she bit him. He stabbed her in the eye when she tried to scream for Robinson to help her. The knife blade broke off in her eye. Defendant stated that he "blacked out," "freaked out," and "killed her." Later, at trial, defendant would testify that he "had to end that fight. She was trying to get the knife back."
On 11 November 2011, Dr. Sam Davis, a pathologist at Harris Regional Hospital, performed an autopsy on Amy's body. Dr. Davis opined that the cause of death was "exsanguination, or bleeding to death" "due to stab wounds on her neck and eye." Amy had one stab wound in the upper right eyelid, perforating the eyeball, one stab wound in the left anterior neck, and two stab wounds to the anterior right neck, with one wound perforating the external jugular vein. Dr. Davis testified at trial about defensive wounds on the backs of her hands as "a textbook appearance of being stuck in a defensive posture. ... [S]he was not striking, but rather [was] being struck."
*833 On 22 November 2011, defendant was indicted for first-degree murder. Defendant filed a "Notice of Defenses" for accident, diminished capacity, and voluntary intoxication, and later amended his notice to include only diminished capacity and voluntary intoxication. Thereafter, defendant filed a "3rd Amended Notice of Defenses" for self-defense and voluntary intoxication.
The case came on for trial during the 23 May 2015 session of Swain County Superior Court, the Honorable Marvin P. Pope, Jr., Judge presiding. The jury returned a verdict of guilty of second-degree murder, and the trial court entered judgment and imposed a sentence of 180 to 225 months imprisonment. Defendant appeals.
_________________________
On appeal, defendant contends the trial court (I) violated a statutory mandate or committed plain error by giving erroneous jury instructions on self-defense; (II) erred by sending inflammatory photographs of the decedent's body to the jury deliberation room; and (III) erred by failing to intervene and stop the prosecutor from making improper closing arguments.
I
Defendant first argues that the trial court erroneously instructed the jury on self-defense when all the evidence showed that Amy was the aggressor. Defendant also contends that this issue is "preserved for review as a matter of law," despite his failure to object to the jury charge at trial. We disagree and review for plain error. See State v. Juarez , 369 N.C. 351, 357-58, 794 S.E.2d 293, 299-300 (2016) (reviewing for plain error the defendant's challenge to the trial court's jury *219 instruction on the aggressor doctrine of self-defense where the defendant did not object to the instruction as given at trial).
Rule 10 the North Carolina Rules of Appellate Procedure provide that "[a] party may not make any portion of the jury charge or omission therefrom the basis of an issue presented on appeal unless the party objects thereto before the jury retires to consider its verdict, stating distinctly that to which objection is made and the grounds of the objection ...." N.C. R. App. P. 10(a)(2) (2017). "For error to constitute plain error, a defendant must demonstrate that a fundamental error occurred at trial." State v. Lawrence , 365 N.C. 506, 518, 723 S.E.2d 326, 334 (2012) (citation omitted). "To show that an error was fundamental, a defendant must establish prejudice that, after examination of the entire record, the error 'had a probable impact on the jury's finding that the defendant was guilty.' " Id. (citation omitted) (quoting State v. Odom , 307 N.C. 655, 660, 300 S.E.2d 375, 378 (1983) ).
*834 "An individual is the aggressor if he 'aggressively and willingly enters into a fight without legal excuse or provocation.' " State v. Effler , 207 N.C. App. 91, 97, 698 S.E.2d 547, 551 (2010) (quoting State v. Potter , 295 N.C. 126, 144, 244 S.E.2d 397, 409 (1978) ). "It is undisputed that '[a] person is entitled under the law of self-defense to harm another only if he is "without fault in provoking, engaging in, or continuing a difficulty with another." ' " Id. at 98, 698 S.E.2d at 552 (quoting State v. Stone, 104 N.C. App. 448, 451-52, 409 S.E.2d 719, 721 (1991) ). "This Court has repeatedly held that 'where the evidence does not indicate that the defendant was the aggressor, the trial court should not instruct on that element of self-defense.' " State v. Vaughn , 227 N.C. App. 198, 202, 742 S.E.2d 276, 278 (2013) (quoting State v. Jenkins , 202 N.C. App. 291, 297, 688 S.E.2d 101, 105 (2010) ).
"[T]he judge has the duty to instruct the jury on the law arising from all the evidence presented." State v. Smith , 360 N.C. 341, 346, 626 S.E.2d 258, 261 (2006) (quoting State v. Moore , 75 N.C. App. 543, 546, 331 S.E.2d 251, 253 (1985) ). "In instructing the jury with respect to a defense to a criminal charge, 'the facts must be interpreted in the light most favorable to the defendant.' " State v. Holloman , 369 N.C. 615, 625, 799 S.E.2d 824, 831 (2017) (quoting State v. Montague , 298 N.C. 752, 755, 259 S.E.2d 899, 902 (1979) ). It is considered error to charge the jury on the aggressor doctrine where "the record ... discloses no evidence tending to show that the defendant brought on the difficulty or was the aggressor[.]" Vaughn , 227 N.C. App. at 203, 742 S.E.2d at 279 (emphasis added) (quoting State v. Washington , 234 N.C. 531, 535, 67 S.E.2d 498, 501 (1951) ).
In the instant case, defendant challenges the following portion of the jury instructions:
If the defendant voluntarily and without provocation entered the fight, the defendant could be considered the aggressor, unless the defendant thereafter attempted to abandon the fight. ...
....
The defendant is not entitled to the benefit of self-defense if the defendant was the aggressor with the intent to kill or inflict serious bodily harm upon the deceased.
Contrary to defendant's assertion otherwise and far from "no evidence," see id. (citation omitted), there was sufficient evidence presented at trial that defendant was the aggressor. For example, a DVD
*835 recording of defendant's 10 November 2011 interview with law enforcement officers was played for the jury in which he described how Amy came at him with the knife, he took the knife away from her, and proceeded to get on top of her and stab her in the neck and then in the eye to keep her from screaming for help. Based on this account to law enforcement, defendant became the aggressor after he gained control of the knife and then proceeded to get on top of Amy and stab her. Even though the jury also heard evidence-defendant's testimony-that Amy kept trying to regain control of the knife, defendant not only maintained control of the knife throughout the remainder of the fight, but he also continued the fight until Amy was killed.
This Court has previously noted that "the lack of injuries to [the] defendant, compared *220 to the nature and severity of the wounds on [the victim] at his death, [was] sufficient evidence from which a jury could find that [the] defendant was the aggressor or that [the] defendant used excessive force." State v. Presson , 229 N.C. App. 325, 330, 747 S.E.2d 651, 656 (2013). Here, too, defendant had no visible injuries aside from a few scratches which defendant admitted he sustained after running through the woods the next morning. In contrast, Amy sustained stab wounds to the eye and the neck, as well as lacerations on her back, shoulder, lip, cheek, temple, hands, and fingers. Furthermore, the pathologist who performed the autopsy on Amy testified that "[t]his [was] a textbook appearance of being stuck in a defense position. ... This is simply a classic example of defensive wounds .... [S]he was not striking, but rather being struck."
Defendant's text messages to Bradley prior to Amy's killing also provide sufficient evidence from which a jury could find that defendant was the aggressor. From 8:11 p.m. until 8:21 p.m., defendant sent multiple text messages stating he was going to kill Amy, even asking for lime (or "line," as defendant's referred to it) to help dispose of the body. As such, the jury could reasonably infer and find that defendant's testimony was not credible and that instead of fending off an attack from Amy, he instead instigated the fight with her in order to kill her, as he stated earlier via text message he wanted to do. Accordingly, the trial court did not err in instructing the jury on the aggressor doctrine where sufficient evidence supported the instruction. Defendant's argument is overruled.
II
Defendant next argues the trial court erred by sending inflammatory photographs of the decedent's body to the jury deliberation room, over defendant's objection, in violation of N.C. Gen. Stat. § 15A-1233.
*836 Defendant contends that sending the exhibits to the deliberation room without his consent constitutes error and that considering the number and content of the photographs, as well as the amount of time the jury viewed them, he was prejudiced by this error. We disagree.
Whether the trial court has violated a statutory mandate is reviewed de novo . State v. Ashe , 314 N.C. 28, 39, 331 S.E.2d 652, 659 (1985).
"Upon request by the jury and with consent of all parties, the judge may in his discretion permit the jury to take to the jury room exhibits and writings which have been received in evidence." N.C. Gen. Stat. § 15A-1233(b) (2015). "Photographs of a homicide victim may be introduced even if they are gory, gruesome, horrible or revolting, so long as they are used for illustrative purposes and so long as their excessive or repetitious use is not aimed solely at arousing the passions of the jury." State v. Chapman , 359 N.C. 328, 350, 611 S.E.2d 794, 812-13 (2005) (quoting State v. Blakeney , 352 N.C. 287, 309-10, 531 S.E.2d 799, 816 (2000) ).
In State v. Cunningham , the North Carolina Supreme Court noted that "[a]lthough the defendant did not object to the sending of the exhibits to the jury room, he did not consent to it as required by the statute." 344 N.C. 341, 364, 474 S.E.2d 772, 783 (1996). However, the Supreme Court concluded that "[i]n light of the strong evidence against the defendant, letting the jury have these items of evidence in the jury room could not have affected the outcome of the trial[,]" and "[a]ssuming this was error, it was harmless." Id. (citation omitted).
In the instant case, defendant filed a pretrial "Motion to Exclude Photographs" and also objected to the jury's request to see all photographic evidence during deliberations, although he did acknowledge that the decision was "in the Court's discretion":
[Defendant's attorney]: Your Honor, I know it's in the Court's discretion, but I would object. I'd prefer for them to rely on the testimony and recollection.
THE COURT: Well-
[Defendant's attorney]: I mean, I know it's in your discretion, Your Honor.
THE COURT: In my discretion, I'm going to allow them to have all the photographs that have been introduced into evidence.
[Defendant's attorney]: Yes, Your Honor.
*221 *837 However, even if defendant "did not consent to [the jury's request] as required by the statute[,]" assuming it was error, it was harmless where defendant has failed to establish that he was prejudiced in light of the overwhelming evidence of defendant's guilt. See id. (citation omitted).
At trial, there were at least 170 or more photographic exhibits admitted into evidence, many of which were indeed images of the deceased's body or portions thereof. However, those photographs showed the circumstances and position of the deceased's body as it was found at the scene and the photographs of the injuries, including close-up views, were also relevant to show the type, severity, and number of injuries sustained by the deceased. They were necessary to depict the extent and nature of her injuries, as well as the location and position-inside a closet-in which she was found by law enforcement. This photographic evidence was the best evidence to help illustrate the responding officers' testimony. Indeed, defendant did not object to the admission of these photographs into evidence; he only objected to the trial court's decision to allow the photographs into the jury deliberation room. Defendant has not established how he was prejudiced by the trial court's decision to allow the jurors to review photographic exhibits which they had already seen.
In any event, there was more than sufficient evidence for a jury to find beyond a reasonable doubt that defendant committed second-degree murder and did not act in self-defense. Dr. Davis testified that Amy was struck in a defensive posture and that she "was not striking, but rather being struck." According to defendant's own testimony, he obtained control and possession of the knife and proceeded to stab Amy in the eye and the neck. Lastly, defendant's several text messages sent to Bradley prior to the murder also indicated that defendant intended to kill Amy. Defendant stated repeatedly that he was going to kill Amy and asked for lime to help dispose of the body.
Based on all of the forgoing, even if it was error for the trial court to allow the jury to review photographs of the deceased victim during jury deliberations without defendant's consent, this error was harmless where defendant has not established that he was prejudiced thereby. Defendant's argument is overruled.
III
Lastly, defendant contends the trial court erred by failing to intervene ex mero motu during the State's closing argument. Specifically, defendant contends the prosecutor's closing arguments were grossly improper as they injected the prosecutor's personal beliefs, appealed to the jury's passion, and led the jury away from the evidence. We disagree.
*838 "The standard of review for assessing alleged improper closing arguments that fail to provoke timely objection from opposing counsel is whether the remarks were so grossly improper that the trial court committed reversible error by failing to intervene ex mero motu ." State v. Jones , 355 N.C. 117, 133, 558 S.E.2d 97, 107 (2002) (citing State v. Trull , 349 N.C. 428, 451, 509 S.E.2d 178, 193 (1998) ).
In other words, the reviewing court must determine whether the argument in question strayed far enough from the parameters of propriety that the trial court, in order to protect the rights of the parties and the sanctity of the proceedings, should have intervened on its own accord and: (1) precluded other similar remarks from the offending attorney; and/or (2) instructed the jury to disregard the improper comments already made.
Id.
"The scope of jury arguments is left largely to the control and discretion of the trial court, and trial counsel will be granted wide latitude in the argument of hotly contested cases." State v. Call , 349 N.C. 382, 419, 508 S.E.2d 496, 519 (1998) (citation omitted). Closing arguments must "(1) be devoid of counsel's personal opinion; (2) avoid name-calling and/or references to matters beyond the record; (3) be premised on logical deductions, not on appeals to passion or prejudice; and (4) be constructed from fair inferences drawn only from evidence properly *222 admitted at trial." Jones , 355 N.C. at 135, 558 S.E.2d at 108.
In the instant case, defendant challenges the following portions of the prosecutor's argument as "grossly improper":
But in this case, in this case, from the get-go, from the time you were seated ... the State unequivocally, without any doubt, does not feel this defendant deserves the legal right to kill Amy Chapman in self-defense. That means he walks.
....
So from the get-go I will say it and will say it until this process is done and will continue to believe that. This defendant does not have the legal right to kill Amy Chapman in self-defense. He doesn't get the opportunity to get any lesser included offense based on self-defense.
....
*839 [D]oes he have that right? Does he? You're going to make that decision. I've made mine up.
....
[Does] [defendant] have the right to kill Amy Chapman in self-defense? If you want to go back and deliberate and say yes, he did, then you've got to do what you've got to do. You got to do it. I respectfully disagree.
....
It's convenient now, after he's been interviewed and then transcribed that he now changes his story from up on top of her, stabbing her, straddling her. Now they're on the ground and she's grabbing for his groin area and trying to get to the knife.
At this point, defendant objected and the trial court sustained the objection but gave no curative instruction or otherwise instructed the prosecutor not to give his personal opinion.
... [W]hat was his interest in changing his statement to that, to that? One is possibly getting a self-defense instruction. So that's what the law allows him to, based on the evidence that's been presented through his testimony.
....
So we know he intended to kill her, because he's offering self-defense. He's offering self-defense. He got up here and says it was me or her. So what's he saying? I intended to kill her. I intended to do it. I'm proud of it.
The prosecutor then referenced letters defendant wrote to his family:
Oh, I couldn't say much in my letters. I mean, come on. You're talking to family here. It was an accident. I would hate to see what wasn't an accident, you know.
....
I went at 1:00 a.m. and went and saw [Robinson]. I was checking on him, he's got diabetes. Are you kidding me? Hate to keep using that. ...
No, it's because you hope he didn't hear anything, and you're making sure he didn't. That's what he was doing.
*840 That's what he was checking on. Checking on his diabetes, give me a break.
Error will not be found "in a trial court's failure to intervene in closing arguments ex mero motu unless the remarks were so grossly improper they rendered the trial and conviction fundamentally unfair ." State v. Allen , 360 N.C. 297, 306-07, 626 S.E.2d 271, 280 (2006) (emphasis added) (citing Call , 349 N.C. at 419-20, 508 S.E.2d at 519 ). "[T]he impropriety of the argument must be gross indeed in order for this Court to hold that a trial judge abused his discretion in not recognizing and correcting ex mero motu an argument which defense counsel apparently did not believe was prejudicial when he heard it." State v. Smith , 359 N.C. 199, 218, 607 S.E.2d 607, 621 (2005) (alteration in original) (quoting State v. Kemmerlin , 356 N.C. 446, 470, 573 S.E.2d 870, 887 (2002) ).
In the instant case, the challenged portions of the prosecutor's closing argument-and to which defendant did not object at trial-when taken in context of his entire argument, draw reasonable inferences based on defendant's inconsistent statements and point out those inconsistencies in defendant's testimony. The prosecutor's asides such as "Are you kidding me?" and "give me a break" and "come on," do not reflect the *223 prosecutor's personal opinion, but rather point out inconsistencies in defendant's testimony. Further, with regard to the prosecutor's statement that he would "respectfully disagree" with the jury if they decided to deliberate and find that defendant killed Chapman in self-defense, even if this argument was improper, it was not so grossly improper as to render the trial and conviction "fundamentally unfair" and warrant the trial court's intervention ex mero motu . See State v. Gladden , 315 N.C. 398, 426, 340 S.E.2d 673, 690 (1986) (finding that it was not so grossly improper for the trial court to decline to intervene ex mero motu where the prosecutor argued that he "probably wouldn't [tell the truth] either" if he "was in [the defendant's] shoes"); cf. State v. Walters , 357 N.C. 68, 102-05, 588 S.E.2d 344, 363-66 (2003) (finding the prosecutor's argument improper where he compared the defendant to Adolf Hitler, over the defendant's objection, by imploring the jury to "stand up to evil" like Winston Churchill did "when he stood up to Hitler," but also finding that the "necessary showing of prejudice was not met").
Accordingly, where the prosecutor's argument was not so grossly improper as to render defendant's trial and conviction fundamentally unfair, the trial court did not err when it declined to intervene ex mero motu during the prosecutor's closing argument. Defendant's argument is overruled.
*841 NO PREJUDICIAL ERROR.
Judge DILLON concurs.
Judge ARROWOOD dissents in a separate opinion.