STATE OF NORTH CAROLINA v. JEFFREY RAY JENKINS

No. COA09-546

(Filed 2 February 2010)

**Criminal Law— jury instructions—self-defense**

In a prosecution resulting in defendant's conviction for voluntary manslaughter, the trial court committed reversible error by instructing the jury that defendant could not avail himself of the benefit of self-defense if he was the aggressor. Because there was no evidence presented at trial that defendant was the aggressor, the trial court should not have instructed on that element of self-defense.

Appeal by Defendant from judgment and sentence entered 26 September 2008 by Judge Timothy L. Patti in Superior Court, Mecklenburg County. Heard in the Court of Appeals 15 October 2009.

*Appellate Defender Staples Hughes, by Assistant Appellate Defender Kristen L. Todd, for Defendant.*

*Attorney General Roy Cooper, by Assistant Attorney General Leonard G. Green, for the State.*

STEPHENS, Judge.

On 26 September 2008, a jury found Jeffrey Ray Jenkins ("Defendant") guilty of voluntary manslaughter. The trial court sentenced Defendant to a term of 103 months to 133 months imprisonment. From judgment entered upon the jury's verdict, Defendant appeals.

### I. Factual Background and Procedural History

The evidence presented at trial tended to show the following: Defendant and Charles Lee Melton ("Melton") had known each other for approximately 12 years. Melton lived about a block from Defendant's home in Matthews, North Carolina. Melton frequently showed up at Defendant's home unannounced and often brought "a case of beer . . . wanting to drink." On Friday, 10 February 2006 at approximately 5:00 p.m., Melton arrived at Defendant's house wanting to "hang out." Defendant showered, changed clothes, and did laundry while Melton watched television and played video games.

At approximately 6:00 p.m., Melton went to a store and returned carrying a 24-ounce beer. At approximately 7:00 p.m., Defendant and Melton left Defendant's house and went to a nearby restaurant, where they had dinner and each had one beer. During dinner, Defendant and Melton discussed their plans for the evening. Defendant and Melton decided to go to a bar called the "Double Door" with Defendant's friend, Ericka Rickman ("Rickman"). Defendant and Melton returned to Defendant's house, and at approximately 8:30 p.m., Rickman and Crystal Jenkins[1] ("Ms. Jenkins") arrived at Defendant's house to take them to the bar. Rickman testified that neither Defendant nor Melton appeared to be intoxicated and they were friendly toward each other.

The group arrived at the Double Door at approximately 10:00 p.m. where they met up with a few of Rickman's co-workers whom she introduced to Defendant and Melton. Rickman and Defendant danced, played pool, and talked for most of the evening, while Melton remained at the bar. While they were at the Double Door, Rickman had "a couple of mixed drinks[,]" Defendant had three to four beers, and Melton drank a few shots of liquor and drank beer.

---

1. Crystal Jenkins is not related to the Defendant.

At approximately 11:30 p.m., Melton got into an argument with another patron and was escorted out of the bar. Rickman, Defendant, and Ms. Jenkins went outside to find Melton. Rickman testified that Melton was very angry and that he tried to start a fight with the bouncers. She said she and Defendant tried to calm Melton down, but that Melton did not respond and "just wanted to stare at the bouncers" and was "sizing up the bouncers at the door."

The group left the Double Door, and Ms. Jenkins drove Defendant, Melton, and Rickman to Defendant's house at approximately 1:00 a.m. Defendant asked Melton if he was able to walk home, and Melton said that he was. Defendant told Melton goodbye and went into the bathroom. Rickman went into Defendant's bedroom and laid down on the bed.

When Defendant exited the bathroom, he found Melton standing in the doorway to Defendant's bedroom. Melton told Rickman "that he was sorry that he had to interrupt [Defendant] for a few minutes because he had something he had to do." Defendant testified that Melton grabbed Defendant's arm and started pushing Defendant into the bedroom. Defendant told Melton that he was tired and did not want to play, and Defendant asked Melton to leave. Melton ignored Defendant's request, pushed Defendant against the bedroom dresser, knocking it over, and wrestled Defendant to the floor. Defendant told Melton to get off of him, but Melton persisted. Melton held one of Defendant's arms and pushed his forearm into Defendant's neck, turning his head sideways.

Defendant struck Melton twice with his hand, and Melton loosened his grip. Defendant pushed Melton off of him and started to get up, but Melton tackled Defendant back to the ground. Melton put both of his hands around Defendant's neck and started choking him. Defendant tried to remove Melton's arms but was unable to get out of his grip. Defendant reached with one hand and tried to gouge Melton's eye, but Melton stopped him. Defendant was eventually able to push Melton off with his feet.

As Defendant was getting up, he was standing beside his desk, where he kept a loaded handgun. Defendant reached for the gun, and as he turned to see Melton coming toward him, Defendant fired the gun at Melton one time. Melton fell backward clutching his chest. Defendant ran to his roommate's bedroom and told him to call 911.

Defendant placed the gun on the kitchen counter. Defendant testified that he was "panicked[,]" "[s]cared[,]" and "confused." Defend-

ant stepped outside with the gun and threw the gun toward some bushes near the edge of the driveway. Defendant testified that if Melton had put his hands around Defendant's neck again, he would have killed Defendant.

Rickman testified that she sat up when she heard the gun shot, and she saw Melton stumble backwards and fall. Rickman immediately ran over to Melton and called 911. Rickman testified that when she called 911, the operator tried to advise her on how to administer CPR. Defendant's roommate checked Melton's vital signs, told Melton to "hang on[,]" and tried to administer CPR. Rickman testified that Defendant was "completely panicked" and that she "had never seen him in that state" in the 13 years she had known him.

Sergeant Barry Price and Detective Brian Ridge (collectively "the officers") of the Matthews Police Department responded to the call at Defendant's home, which came in at 1:22 a.m. on 11 February 2006. The officers were less than a quarter of a mile away when they received the call, and they arrived at Defendant's house in less than 30 seconds. When they arrived, the officers saw Defendant run out from behind the house. Sergeant Price pulled his gun and told Defendant to stop. Defendant held his hands in the air and said, "[H]e's in there. Someone go in and help him." Defendant told the officers that he shot Melton and that he threw the gun into some brush.

Neither Detective Ridge nor EMS personnel were able to revive Melton. After learning that Melton had passed away, Sergeant Price read Defendant his *Miranda* rights and asked if he understood those rights, to which Defendant responded that he did. Sergeant Price put Defendant in the patrol car and advised Defendant that he was under arrest for homicide.

The officers found Defendant's gun about an hour later in a tree beside Defendant's house. One shell casing found in Defendant's bedroom matched the handgun. Thomas Owens ("Owens"), a medical examiner for Mecklenburg County, testified as an expert in clinical, anatomical, and forensic pathology. Owens testified that the cause of Melton's death was one gunshot wound to the chest. The characteristics of the gunshot wound showed that the muzzle of the gun was about one foot to one and a half feet from Melton when the gun was fired. Owens also testified that toxicology tests showed that Melton's blood contained 240 milligrams of alcohol per deciliter of blood, which translated to a 0.24 blood alcohol level on a breathalyzer test.

**STATE v. JENKINS**

[202 N.C. App. 291 (2010)]

Melton's mother, Wanda Pigg, testified that Melton was happy and in good health when she spoke to him on the evening of 10 February 2006. Defendant testified that Melton had a reputation for violence and stated that he had "a short fuse." Defendant testified about several violent incidents that he was aware of involving Melton. The first incident occurred when Melton was 16 years old and Defendant had just met him. Defendant was at a friend's house and he heard a commotion in the living room. Defendant walked in the living room to find Melton straddling Melton's child's mother, Jessica, and choking her. Melton had to be physically pulled off of Jessica.

Defendant testified about a second incident which happened six weeks before Melton's death. On that occasion, Defendant, Melton, and a few other friends were at Jesse Rushing's ("Rushing") house. Rushing and Melton began wrestling. Melton put his hands around Rushing's throat, strangling him, and Rushing's face turned purple. Defendant testified that he and two others had to pull Melton off of Rushing, and that Melton was then asked to leave.

Defendant testified that he "would not wrestle [Melton] under [his] own free will" because he knew Melton was violent and strong and he "just wasn't going to put [himself] in that situation." Defendant further testified that he knew Melton had been arrested for pulling a gun on someone, that Melton had a conviction for assault on a female, and that Melton had served four months in jail for slashing someone's tires and fought the police when they came to arrest him. David Ingram and Erin Bozeman testified on behalf of Defendant that they knew Melton had a reputation for violence, that he was known to get out of hand, and that he was known to be aggressive.

During the charge conference, defense counsel requested that the trial court alter the pattern instruction for self-defense because there was no evidence that Defendant was the aggressor. The trial court denied this request and gave the pattern instruction for self-defense which provides that Defendant is not entitled to the benefit of self-defense if he was the aggressor.

## II. Discussion

Defendant raises three issues for appellate review: Defendant first argues that the trial court committed reversible error by prohibiting certain witnesses from testifying to specific instances of violence by Melton. Defendant also argues that the trial court committed plain error by allowing Melton's mother to testify because "her testi-

mony was irrelevant, contained improper character and victim impact evidence, was substantially more prejudicial than probative, and was marked by questions that assumed facts not in evidence[.]" Finally, Defendant argues the trial court committed reversible error by instructing the jury that to receive the benefit of self-defense, Defendant could not have been the aggressor. We agree with Defendant's final argument. Because we award Defendant a new trial for error in the trial court's instruction, this issue is dispositive and it is, thus, unnecessary to address Defendant's remaining arguments.

During the charge conference, defense counsel requested that the trial court alter the pattern instruction for self-defense so that the language regarding whether Defendant was the aggressor be stricken. The State objected, arguing that the definition of "aggressor" included "willing combat, willing affray." The State contended that there was evidence that Defendant and Melton entered into a friendly wrestling match, and thus, that Defendant could be deemed to have been the aggressor because he voluntarily entered into the affray. The trial court denied defense counsel's request and instructed the jury in part as follows:

> The defendant would not be guilty of any murder or manslaughter if he acted in self-defense as I have just defined it to be and if he was not the aggressor in bringing on the fight and did not use excessive force under the circumstances.

> If the defendant voluntarily and without provocation entered the fight he would be considered the aggressor unless he thereafter attempted to abandon the fight and gave notice to the deceased that he was doing so.

> One enters a fight voluntarily if he uses toward his opponent abusive language which considering all of the circumstances is calculated and intended to bring on a fight.

> A defendant uses excessive force if he uses more force than reasonably appeared to him to be necessary at the time of the killing.

Our Court reviews a trial court's decisions regarding jury instructions de novo. State v. Osorio, —— N.C. App. ——, ——, 675 S.E.2d 144, 149 (2009). "The prime purpose of a court's charge to the jury is the clarification of issues, the elimination of extraneous matters, and a declaration and an application of the law arising on the evidence." State v. Cameron, 284 N.C. 165, 171, 200 S.E.2d 186, 191 (1973). "[A] trial judge should not give instructions to the jury which are not

supported by the evidence produced at the trial." *Id.* Moreover, "[w]here jury instructions are given without supporting evidence, a new trial is required." *State v. Porter,* 340 N.C. 320, 331, 457 S.E.2d 716, 721 (1995).

This Court has held that where the evidence does not indicate that the defendant was the aggressor, the trial court should not instruct on that element of self-defense. For example, in *State v. Tann,* 57 N.C. App. 527, 291 S.E.2d 824 (1982), our Court awarded the defendant a new trial where, although it was undisputed that the defendant was not the aggressor, the trial court instructed the jury that the defendant "could not avail himself of the doctrine of self[-]defense if 'he . . . used excessive force *or was the aggressor.*' " *Id.* at 531, 291 S.E.2d at 827; *see also State v. Temples,* 74 N.C. App. 106, 109, 327 S.E.2d 266, 268 (1985) (holding the trial court erred by instructing the jury that " '[o]ne enters a fight voluntarily if she uses toward her opponent abusive language which considering all the circumstances is calculated and intended to bring on a fight' " where there was no evidence tending to show the defendant voluntarily entered a fight with the deceased based on her use of abusive language).

Furthermore, in *State v. Ward,* 26 N.C. App. 159, 163, 215 S.E.2d 394, 396-97 (1975), this Court awarded the defendant a new trial after the trial court instructed the jury that "the burden was on the defendant to satisfy it that he was not the aggressor and that if the jury believed that he was the aggressor or used excessive force in repelling an assault, though it found he was otherwise acting in self-defense, he would be guilty of manslaughter." *Id.* at 163, 215 S.E.2d at 396. In *Ward,* there was no evidence that the defendant was the aggressor, and in fact, all of the evidence "tend[ed] to show that the deceased was the aggressor up to the instant the defendant fired the fatal shot." *Id.* at 163, 215 S.E.2d at 397. Our Court further held that

> [s]ince the jury found the defendant guilty of manslaughter, it seems likely, under the circumstances in this case, that the jury believed the defendant acted in self-defense but used excessive force or that he, the defendant, was the aggressor. We cannot assume that the jury was more discriminating than the judge and ignored the erroneous instruction while applying the correct one. Thus, the error in giving the instruction complained of was prejudicial.

*Id.*

In the present case, the evidence presented at trial tended to show that Melton had a reputation for violence and that he had been argumentative earlier in the evening on 10 February 2006. Melton initiated the fray by grabbing Defendant's arm and pushing Defendant into the bedroom. Defendant told Melton that he did not want to play and asked Melton to leave. Melton ignored Defendant's request, pushed Defendant, and wrestled Defendant to the floor. Defendant told Melton to get off of him, but Melton continued to fight. Only when Melton was holding one of Defendant's arms and pushing his forearm into Defendant's neck did Defendant strike back at Melton. Melton nevertheless tackled Defendant back to the floor and began choking Defendant with both of his hands. Defendant struggled to escape Melton's grip and was unsuccessful when he attempted to gouge Melton's eye. Defendant was finally able to push Melton off of him, and immediately reached for a gun located on a nearby desk and fired the gun one time at Melton.

The State argues on appeal that the following facts constitute substantial and competent evidence that Defendant was the aggressor: (1) that Melton was stumbling when they left the bar and Defendant had to help Melton into the car; (2) that Defendant had grown tired of Melton coming to his home and that Defendant asked Melton to leave on the evening of 10 February 2006; (3) that Defendant and Melton had wrestled in the past and that at first, Rickman did not think their wrestling that night was out of the ordinary; (4) that Rickman stepped over Defendant and Melton when she exited Defendant's bedroom, that Rickman heard Defendant tell Melton to be careful with his new tattoo, and that Rickman heard Defendant laughing when Melton knocked things over in the bedroom; (5) that while Melton and Defendant were wrestling, Defendant struck Melton twice; (6) that Melton had bruises on his face, head, arms, and hands, while Defendant did not display any injuries to his head or neck despite his testimony that Melton attempted to choke him; and (7) that Defendant shot Melton at close range. Of the State's seven identified facts in support of its argument, only number four gives us pause. The remaining factual assertions are either irrelevant to the events that occurred when Defendant and Melton arrived home from the bar or do not support the State's argument that Defendant voluntarily entered into the affray.

Although we are not persuaded by the State's fourth factual assertion, we nevertheless address this claim. Rickman testified that at first, she did not believe the wrestling between Melton and Defendant

was out of the ordinary, and that she heard Defendant tell Melton to be careful with a new tattoo Defendant had recently gotten on his neck. When asked by the State if Rickman told the police that Defendant was laughing about Melton knocking things over in the bedroom, Rickman replied, "In my mind I think he was trying to reel [Melton] back in to let's not take this so serious." Thus, despite the State's contention that Defendant "joined in a friendly wrestling match" with Melton, Rickman's testimony actually serves to further establish that Defendant attempted to calm Melton and prevent the fray from escalating to the point that it did. There is no evidence that Defendant initiated the altercation or that he provoked Melton to continue to wrestle once the fighting began. As was true in *Ward*, all of the evidence "tends to show that the deceased was the aggressor up to the instant the defendant fired the fatal shot." *Id.*

As we held in *Tann*, *Temples*, and *Ward* where there was no evidence that the defendant was the aggressor, it was error in the present case to instruct the jury that Defendant could not avail himself of the benefit of self-defense if he was the aggressor. Moreover, as was the case in *Ward*, the jury found Defendant guilty of voluntary manslaughter, and thus, the jury likely believed Defendant either used excessive force or was the aggressor. *See id.* Accordingly, the trial court's error was prejudicial and Defendant is entitled to a

NEW TRIAL.

Judges STROUD and BEASLEY concur.