IN THE COURT OF APPEALS OF NORTH CAROLINA

2022-NCCOA-263

No. COA20-665

Filed 19 April 2022

Randolph County, No. 17 CRS 52825

STATE OF NORTH CAROLINA,

v.

WENDY DAWN LAMB HICKS, Defendant.

Appeal by Defendant from judgment entered 12 December 2019 by Judge V. Bradford Long in Randolph County Superior Court. Heard in the Court of Appeals 13 April 2021.

*Attorney General Joshua H. Stein, by Assistant Attorney General Joseph L. Hyde, for the State.*

*Marilyn G. Ozer, for Defendant- Appellant.*

WOOD, Judge.

¶ 1 Defendant Wendy Hicks ("Defendant") appeals from her conviction of second-degree murder. On appeal, Defendant contends the trial court erred by instructing the jury on the aggressor doctrine and committed plain error by allowing certain exhibits to be published to the jury without a limiting instruction. For the reasons stated herein, we reverse and remand for a new trial.

## I. Factual and Procedural Background

In September 2015, Defendant and the deceased, Caleb Adams ("Caleb"), met through their employment at Dart Container in Randleman, North Carolina. At the time, Caleb was married to Dana Adams ("Dana") and the couple had three children together. Three weeks after they met, Defendant and Caleb began an intimate relationship in which they would meet at a warehouse to have sexual intercourse. Caleb and Defendant maintained their affair from September 2015 until Caleb's death on June 13, 2017.

While employed at Dart Container, Caleb maintained sexually intimate relationships with several women. At some point, one of the other women discovered Caleb's infidelity and argued with him, causing an internal investigation. Thereafter, Caleb obtained employment at Murphy Trucking. Caleb told his wife, Dana, he obtained employment at Murphy Trucking because Dart Container had changed its policies. Defendant and Caleb had a tumultuous relationship and had several vehement arguments. During their relationship, they frequently referred to each other in a vulgar manner. The Record is replete with text-messages between Defendant and Caleb that reflect the ardent nature of their relationship.

In early 2017, Caleb[1] and Defendant began taking methamphetamine together. Caleb introduced Defendant to methamphetamine and taught her how to

---

[1] Caleb had a history of substance abuse.

smoke it. Upon the arrest of Caleb's methamphetamine supplier, Defendant introduced Caleb to a man named "Doug." Defendant testified that, after a while, she began performing oral sex on Doug at Caleb's instruction, to pay for the methamphetamine. According to Defendant's testimony, consuming methamphetamine affected Caleb's emotional state. Specifically, Defendant stated the methamphetamine consumption caused Caleb to become angry.

¶ 5 Beginning in May and June 2017, Dana noticed significant changes in Caleb's behavior. For example, on May 22, 2017, the husband and wife exchanged text messages concerning his whereabouts, in which Dana asked Caleb where he was sleeping because she noticed his sleep habits had changed. A few days later, the couple exchanged angry text messages about a picture Defendant posted on Facebook depicting Defendant and Caleb kissing. Around this same time, Defendant began placing anonymous calls to Dana. On the morning of June 8, 2017, Defendant informed Dana that she and Caleb were having an affair. On June 11, 2017, Caleb was helping one of his children work on a boat when he received a phone call. After receiving the call, Caleb left the family's residence and did not return for approximately ten hours. The following morning, Dana discovered Caleb had slept in their camper rather than the bed they usually shared.

¶ 6 During the week of June 12, 2017, Defendant and Caleb had several arguments, including an argument regarding a photograph of the couple kissing that

she had posted to the social media networking site, Facebook. Defendant also testified Caleb was upset and angry because his supplier had raised the price of methamphetamine and he was concerned about owing people money.

¶ 7    On the morning of June 12, 2017, Caleb was not at the couple's residence when Dana woke up. When she called him, Caleb told his wife he was at work and would be home that evening. Rather than going to work, however, Caleb traveled to Defendant's residence in the early morning. At trial, Defendant's daughter, April,[2] testified that she was awakened by Defendant and Caleb arguing that morning. According to April's testimony, Caleb slung the door to their residence open, causing the door to hit a baby gate that Defendant had in place for her household pets. Caleb proceeded to enter the home and to scream profanities and threats at Defendant. April heard Caleb say, "I've never hit a bitch but you're pushing me to bust your damn head" and that Defendant was ruining his life and his family. April sent messages to her boyfriend describing the events as they occurred because she was afraid. At some point that morning, Defendant managed to get Caleb to calm down, and he left the residence.

¶ 8    That evening Caleb sent text messages to Defendant. Defendant replied that she would leave his drugs on the nightstand in her bedroom, and around 9:15 p.m.

---

[2] In June 2017, April was seventeen years old and resided with Defendant.

Caleb picked up his drugs. Around 11:30 p.m., Defendant threatened to send sexually explicit photographs to Dana to expose Caleb's affair. Approximately half an hour later, around midnight, Defendant called Dana, identified herself, and told her that she and Caleb were having an affair. Defendant also told Dana that Caleb was using recreational drugs. During the conversation, Defendant told Dana she and Caleb had been arguing and asked if he was ever a violent person. Defendant explained that Caleb had threatened her and that she was concerned for her safety.[3] Dana was not aware of Caleb's behavior on the morning of June 12, 2017. Dana told Defendant that Caleb had never been violent with her and stressed that he needed assistance with his substance abuse.

¶ 9        Later that evening, an unknown and unidentified man arrived at Defendant's residence. He stood in Defendant's yard and yelled, "[W]here's Caleb?" Defendant informed the man that Caleb was not at her residence, and the man instructed Defendant to tell Caleb to "call his people." In response, Defendant began calling Caleb repeatedly. Caleb's reply text stated, "You'll be lucky you don't end up in a ditch."

¶ 10        In the early morning hours of June 13, 2017, Defendant and Caleb engaged in one of their episodic arguments. At 5:58 a.m. Caleb texted Defendant, and Defendant

---

[3] Dana testified Caleb was never violent toward her but used coarse language. Dana attributed Caleb's language to truck driver's patios.

called him in response. During this conversation, Caleb told Defendant he was on the way to her house. Defendant told Caleb not to come to her house. Defendant texted Caleb at 6:14 a.m. not to come to her house as people were "looking for [him.]" Caleb ignored Defendant's directive to stay away from her home.

¶ 11        At 6:28 a.m., Defendant received a text message from Caleb that said, "Fuck you." Also, at 6:28 a.m., Defendant texted Doug that Caleb was at her residence. Immediately after Defendant sent that text, Caleb stormed into Defendant's home in an enraged state, located her in her bedroom and demanded that she give her phone to him. At first, Defendant refused to allow Caleb to search her cellphone, but acquiesced when Caleb picked her firearm up off the nightstand and pointed it at her. After searching her phone, Caleb threw it at Defendant. Caleb then turned to leave Defendant's bedroom with her firearm, but she told Caleb that he could not leave with the gun and requested that he leave it at her residence. In anger, Caleb threw the gun down on the nightstand beside Defendant's bed. Defendant picked her firearm and her cellphone up before attempting to exit her bedroom. However, when Defendant tried to leave the bedroom, Caleb began pushing, punching, kicking, and shoving her. Defendant testified at that moment, she thought she was going to die, and that Caleb would hurt her family.

¶ 12        April testified that she heard Caleb burst into the home and slam the door, as

he had done the previous morning.[4] April also heard Caleb tell Defendant he was going to kill her, and she could hear that they were engaged in a physical struggle violent enough to move furniture. During the altercation with Caleb, Defendant fired two shots. The bullets entered Caleb's back. At 6:30 a.m., approximately two minutes after Caleb entered the residence, Defendant called 911 and told the operator that she had shot Caleb.

¶ 13 When law enforcement arrived at Defendant's trailer, they immediately entered the residence. It was apparent that Caleb had died before law enforcement arrived. Law enforcement found a key that fit the front door of Defendant's home next to Caleb's leg. In his pocket, officers found a glass pipe. Officers also found a white substance on Caleb's person and in his truck. The substance tested positive for methamphetamine. At trial, a toxicologist reported that Caleb's blood level for methamphetamine was 1.5 milligrams per liter and the amphetamine level was .12 milligrams per liter. The toxicologist further testified to the effects of methamphetamine, including that it can cause heightened alertness, aggression, paranoia, violence, and sometimes psychosis.

¶ 14 On July 11, 2017, Defendant was indicted on one count of second-degree murder. Defendant's trial began on November 18, 2019. At the charge conference,

---

[4] One of April's friends had slept over that night, and, when April could not get ahold of her boyfriend, she tried to use her friend's cellphone to do so.

defense counsel objected to an instruction on the aggressor doctrine, arguing that the evidence presented did not give any inference Defendant was the aggressor. Defendant's objections were overruled, and the trial court instructed the jury on the aggressor doctrine as an element of self-defense. The jury subsequently convicted Defendant of second-degree murder. Defendant timely gave notice of appeal in open court.

## II.     Analysis

¶ 15      On appeal, Defendant argues the trial court (1) erred in instructing the jury on the aggressor doctrine; and (2) plainly erred in admitting Exhibits 174 and 175.

### A. Aggressor Doctrine

¶ 16      Defendant first contends the trial court committed reversible error by instructing the jury on the aggressor doctrine. We agree.

¶ 17      "A trial court must give the substance of a requested jury instruction if it is 'correct in itself and supported by the evidence . . . .' " *State v. Mercer*, 373 N.C. 459, 462, 838 S.E.2d 359, 362 (2020) (quoting *State v. Locklear*, 363 N.C. 438, 464, 681 S.E.2d 293, 312 (2009)); *see State v. Stephens*, 275 N.C. App. 890, 893-94, 853 S.E.2d 488, 492 (2020) (citation omitted). "[Arguments] challenging the trial court's decisions regarding jury instructions are reviewed *de novo* by this Court." *State v. Osorio*, 196 N.C. App. 458, 466, 675 S.E.2d 144, 149 (2009). "Under a *de novo* review, the court considers the matter anew and freely substitutes its own judgment for that

of the lower tribunal." *State v. Williams*, 362 N.C. 628, 632-33, 669 S.E.2d 290, 294 (2008) (citation and internal quotation marks omitted). "An error in jury instructions is prejudicial and requires a new trial only if there is a reasonable possibility that, had the error in question not been committed, a different result would have been reached at the trial out of which the appeal rises." *State v. Hicks*, 241 N.C. App. 345, 356, 772 S.E.2d 486, 494 (2015) (quoting *State v. Castaneda*, 196 N.C. App. 109, 116, 674 S.E.2d 707, 712 (2009)) (alterations omitted).

¶ 18    "[W]hen a person, who is free from fault in bringing on a difficulty, is attacked in his own dwelling, or home . . . , the law imposes upon him no duty to retreat before he can justify his fighting in self-defense, —*regardless of the character of the assault*." *State v. Benner*, 2022-NCSC-28, ¶ 28 (quoting *State v. Francis*, 252 N.C. 57, 59, 112 S.E.2d 756, 758 (1960). Pursuant to N.C. Gen. Stat. § 14-51.3, "a person is justified in the use of deadly force and does not have a duty to retreat" if he is in a lawful place and "reasonably believes that such force is necessary to prevent imminent death or great bodily harm to himself or herself or another" or "[u]nder the circumstances permitted pursuant to [N.C. Gen. Stat. §] 14-51.2." N.C. Gen. Stat. § 14-51.3(a) (2020). Our Supreme Court has noted that in the event a person is in his own home and is acting in defense of himself or his habitation, he is "not required to retreat in the face of a threatened assault, regardless of its character, but [is] entitled to stand his ground, to repel force with force, and to increase his force, so as not only to resist,

but also to overcome the assault." *Benner*, 2022-NCSC-28, ¶ 28 (alteration omitted)

(quoting *Francis*, 252 N.C. at 60, 112 S.E.2d at 758). Additionally, under Section 14-51.2:

> (b) The lawful occupant of a home . . . is presumed to have held a reasonable fear of imminent death or serious bodily harm to himself or herself or another when using defensive force that is intended or likely to cause death or serious bodily harm to another if both of the following apply:
>
> (1) The person against whom the defensive force was used was in the process of unlawfully and forcefully entering, or had unlawfully and forcibly entered, a home . . . or if that person had removed or was attempting to remove another against that person's will from the home. . . .
>
> (2) The person who uses defensive force knew or had reason to believe that an unlawful and forcible entry or unlawful and forcible act was occurring or had occurred.

N.C. Gen. Stat. § 14-51.2(b) (2020). The presumption outlined in Subsection (b) is

rebuttable and does not apply if "[t]he person against whom the defensive force is

used has the right to be in or is a lawful resident of the home . . ." or if "[t]he person

against whom the defensive force is used (i) has discontinued all efforts to unlawfully

and forcefully enter the home . . . and (ii) has exited the home." N.C. Gen. Stat. § 14-

51.2(c)(1)(5). "A person who unlawfully and by force enters or attempts to enter a

person's home . . . is presumed to be doing so with the intent to commit an unlawful

act involving force or violence." N.C. Gen. Stat. § 14-51.2(d). "A person who uses

force as permitted by this section is justified in using such force and is immune from

civil or criminal liability for the use of such force . . . ." N.C. Gen. Stat. § 14-51.2(e).

¶ 19        Self-defense pursuant to Section 15-51.2 and Section 15-51.3 is not available

to a person who used defensive force, and who

> (2) Initially provokes the use of force against himself or herself. However, the person who initially provokes the use of force against himself or herself will be justified in using defensive force if either of the following occur:
>
> a. The force used by the person who was provoked is so serious that the person using defensive force reasonably believes that he or she was in imminent danger of death or serious bodily harm, the person using defensive force had no reasonable means to retreat, and the use of force which is likely to cause death or serious bodily harm to the person who was provoked was the only way to escape the danger.
>
> b. The person who used defensive force withdraws, in good faith, from physical contact with the person who was provoked, and indicates clearly that he or she desires to withdraw and terminate the use of force, but the person who was provoked continues or resumes the use of force.

N.C. Gen. Stat. § 14-51.4(2) (2020). This provision of our general statutes is known

as the "aggressor doctrine."  The aggressor doctrine "denies a defendant 'the benefit

of self-defense if he was the aggressor in the situation.' " *State v. Corbett*, 269 N.C.

App. 509, 566, 839 S.E.2d 361, 403 (2020) (quoting *State v. Juarez*, 369 N.C. 351, 358,

794 S.E.2d 293, 300 (2016)).

¶ 20        "In determining whether a self-defense instruction should discuss the

'aggressor' doctrine, the relevant issue is simply whether the record contains evidence

from which the jury could infer that the defendant was acting as an 'aggressor' *at the*

*time* that he or she allegedly acted in self-defense." *State v. Mumma*, 372 N.C. 226, 239, n.2, 827 S.E.2d 288, 297, n.2 (2019) (emphasis added). "[W]here the evidence does not indicate that the defendant was the aggressor, the trial court should not instruct on that element of self-defense." *State v. Jenkins*, 202 N.C. App. 291, 297, 688 S.E.2d 101, 105 (2010).

¶ 21    "When there is no evidence that a defendant was the initial aggressor, it is reversible error for the trial court to instruct the jury on the aggressor doctrine of self-defense." *Juarez*, 369 N.C. at 358, 794 S.E.2d at 300. Where the trial court delivers an aggressor instruction "without supporting evidence, a new trial is required." *State v. Vaughn*, 227 N.C. App. 198, 202, 742 S.E.2d 276, 278 (2013) (citation and quotation marks omitted); *see also State v. Porter*, 340 N.C. 320, 331, 457 S.E.2d 716, 721 (1995) (holding "[w]here jury instructions are given without supporting evidence, a new trial is required.").

¶ 22    "Broadly speaking, the defendant can be considered the aggressor when she 'aggressively and willingly enters into a fight without legal excuse or provocation.' " *Vaughn*, 227 N.C. App. at 202, 742 S.E.2d at 279 (quoting *State v. Wynn*, 278 N.C. 513, 519, 180 S.E.2d 135, 139 (1971)); *State v. Thomas*, 259 N.C. App. 198, 209, 814 S.E.2d 835, 842 (2018) (citation omitted); *see also State v. Tann*, 57 N.C. App. 527, 530-31, 291 S.E.2d 824, 827 (1982). The law of this state does not require that a defendant instigate a fight to be considered an aggressor. *State v. Lee*, 258 N.C. App.

122, 126, 811 S.E.2d 233, 237 (2018). Instead, even if Defendant's opponent initiates a fight, a Defendant "who provokes, engages in, or continues an argument which leads to serious injury or death may be found to be the aggressor." *Id.* at 126-27, 811 S.E.2d at 237. To determine which party was the aggressor, courts consider a variety of factors "including the circumstances that precipitated the altercation; the presence or use of weapons; the degree and proportionality of the parties' use of defensive force; the nature and severity of the parties' injuries; or whether there is evidence that one party attempted to abandon the fight." *Corbett*, 269 N.C. App. at 566, 839 S.E.2d at 403.

¶ 23        Applying the above factors to this case, we hold the trial court erred in instructing the jury on the aggressor doctrine. The evidence demonstrated that Defendant directed Caleb not to come to her home. Despite Defendant's instructions not to come, Caleb arrived at Defendant's home and "burst" through the front door in an angry fashion. Caleb opened the Defendant's bedroom door with such violence that the door banged against the furniture in Defendant's bedroom. Caleb yelled that the Defendant was ruining his life and that he was going to kill her. Caleb initiated a physical altercation with Defendant that continued without pause for two minutes. Defendant's daughter, April, was so frightened by the noise of her mother engaged in this struggle that she feared for her own safety.

¶ 24        As to the presence or use of weapons, we note "[t]he mere fact that a defendant

was armed is not evidence that he was the aggressor if he made no unlawful use of his weapon." *Id*. at 569, 839 S.E.2d at 405. Additionally, a "defendant is not required to have a weapon in his possession at all times in order to avoid the necessity of retreating when called upon to defend himself or herself in his or her own home." *Benner*, 2022-NCSC-28, ¶ 26 n.4. Although the evidence demonstrated that Caleb entered the Defendant's home unarmed, upon bursting into Defendant's bedroom, Caleb grabbed Defendant's firearm from her nightstand, took it out of its holster, and pointed it at the Defendant while demanding to see her phone. Even after Caleb threw the Defendant's phone back at her, Caleb continued to have possession of the firearm as he placed the firearm in his pocket and moved towards the bedroom door. After Defendant requested Caleb not to leave her bedroom with the firearm, Caleb relinquished it and Defendant armed herself as a precaution, fearing that Caleb would harm her, her daughter, or her daughter's friend who had stayed the night in the residence.

¶ 25    Moreover, Defendant only armed herself after Caleb threw the firearm down and began pacing around the bedroom with his hands curled up into fists while screaming at the Defendant. When Defendant attempted to leave the bedroom and flee from the altercation, Caleb lunged towards the Defendant and proceeded to kick, push, punch, and shove her. As Defendant was attacked in her own home and feared for the safety of herself and others in her home, Defendant acted in self-defense to

repel Caleb's assaults against her. *See id.*, ¶ 29.

¶ 26          It was during this physical altercation that Defendant resisted Caleb's attacks by firing two successive shots at Caleb from six inches away, within two short minutes of when he entered the residence. These facts do not suggest that Defendant "aggressively and willingly" entered into a fight with Caleb. *See Vaughn*, 227 N.C. App. at 203-04, 742 S.E.2d at 279-80 (citation omitted) (holding that evidence was insufficient to support an aggressor instruction where the defendant fled an altercation with the victim and subsequently armed herself because the evidence did not demonstrate she brought on the original difficulty)*; see also State v. Potter*, 295 N.C. 126, 144, 244 S.E.2d 397, 409 (1978); *Tann*, 57 N.C. App. at 530-31, 291 S.E.2d at 827.

¶ 27          While the State contends Dana's testimony indicating Caleb was not a violent person supports the inference Defendant was the aggressor, this argument is fatally flawed because the point in time where aggressor status may attach is temporally connected with the actual use of force. *Mumma*, 372 N.C. at 239 n.2, 827 S.E.2d at 297 n.2. Caleb threatened Defendant on several occasions including texting to her, "[y]ou'll be lucky you don't end up in a ditch," 30 minutes before his death. In the two minutes between Caleb's arrival to Defendant's home and his death, Caleb threw open Defendant's bedroom door, threatened to kill her, and initiated a physical altercation with Defendant.

¶ 28        The State suggests that Defendant's threats to send sexually explicit photographs to Caleb's wife at 11:31 p.m. on the night before the shooting make Defendant the aggressor. However, a period of seven hours passed between the time Defendant threatened to send photographs to Caleb's wife and the time Defendant shot him. The threats of sending sexual photographs to Caleb's wife are insufficient to support a jury instruction on the aggressor doctrine, because these threats were not made *at the time* the self-defense occurred. *Id.* Moreover, we decline to hold that a threat to expose one's extramarital affair constitutes conduct demonstrating an aggressive willfulness to engage in a physical altercation.

¶ 29        The State also relies on *State v. Cannon*, 341 N.C. 79, 459 S.E.2d 238 (1995) to argue that Defendant's act of shooting Caleb in the back necessarily makes Defendant the aggressor. However, the State's reliance on *Cannon* is misplaced. In *Cannon*, the victim came to the defendant's home with the purpose of engaging in an argument. *Id.* at 83, 459 S.E.2d at 241. The defendant was found to be the aggressor because, during their argument, the "victim straightened her car up to start going down the driveway" and

> [w]hen the victim's car was directed down the driveway, defendant was standing about eight feet away, on the passenger side of the victim's car. Both windows in the victim's car were rolled down. Defendant pulled his gun out of his pocket, cocked it, pointed it at the victim, and shot into the car three times.

*Id.* at 81, 459 S.E.2d at 240. The victim in *Cannon* was actively retreating from the affray, which allowed the defendant the space and time to intentionally draw his firearm. The unbroken chain of events on the morning of June 13 distinguishes this case from *Cannon*. At 6:28 a.m., Caleb came to the residence against the expressed directive of Defendant, forcefully entered her residence and bedroom, threatened to kill Defendant, extorted her cell phone from her by pointing a firearm at her, assaulted Defendant without provocation by punching, pushing, kicking, and shoving when she attempted to escape from her bedroom with the firearm. Less than two minutes later, after Caleb repeatedly assaulted Defendant and Defendant tried to get away from these attacks, Defendant shot Caleb at close range.

¶ 30      Consistent with our Supreme Court's holding in *State v. Washington*, "the record here discloses no evidence tending to show that the defendant *brought on* the difficulty or was the aggressor, [and] it necessarily follows that the instruction as it relates to the evidence in this case was partially inapplicable, incomplete and misleading." 234 N.C. 531, 535, 67 S.E.2d 498, 501 (1951) (emphasis added). Accordingly, we hold the trial court erred in instructing the jury on the aggressor doctrine because the testimony at trial would not permit a reasonable jury to infer that Defendant aggressively and willingly entered into the fight with Caleb, where she expressly instructed him not to come to her residence, yet Caleb disregarded her instructions and then physically assaulted her. *See Juarez*, 369 N.C. at 358, 794

S.E.2d at 300; *State v. Parks*, 264 N.C. App. 112, 115, 824 S.E.2d 881, 884 (2019); *Jenkins*, 202 N.C. App. at 297, 688 S.E.2d at 105.

¶ 31        Because the trial court committed reversible error in Defendant's case by delivering unsupported jury instructions on the aggressor doctrine, this error entitles Defendant to a new trial. *Corbett*, 269 N.C. App. at 581, 839 S.E.2d at 412; *Vaughn*, 227 N.C. App. at 202, 742 S.E.2d at 278.

**B. Exhibits**

¶ 32        Our decision to award the Defendant a new trial based on the trial court's error in instructing the jury on the aggressor doctrine makes it unnecessary to address Defendant's argument that the trial court committed plain error in admitting Exhibits 174 and 175 into evidence. On remand for new trial, we urge the trial court to ensure that admitted evidence is not only relevant, but its probative value is not substantially outweighed by the danger of unfair prejudice. *See* N.C. Gen. Stat. § 8C-1, Rule 401, Rule 403 (2020). On remand, we leave this issue to the learned trial judge in recognition that other evidence may be presented at the new trial.

### III.    Conclusion

¶ 33        For the reasons stated herein, we hold the trial court erred in instructing the jury on the aggressor doctrine. Accordingly, we reverse and remand as Defendant is entitled to a new trial.

REVERSED AND REMANDED FOR NEW TRIAL.

Judges INMAN and MURPHY concur in result only.