IN THE COURT OF APPEALS OF NORTH CAROLINA

No. COA23-90

Filed 3 October 2023

Gates County, No. 18CRS50300

STATE OF NORTH CAROLINA

v.

TERRELL JERMAINE PARKER, Defendant.

Appeal by defendant from judgment entered 21 July 2022 by Judge Wayland J. Sermons Jr. in Gates County Superior Court. Heard in the Court of Appeals 22 August 2023.

*Attorney General Joshua H. Stein, by Special Deputy Attorney General Robert C. Montgomery for the State.*

*Sarah Holladay, for defendant-appellant.*

FLOOD, Judge.

Terrell Jermaine Parker ("Defendant") appeals his conviction for first-degree murder arguing (1) he received ineffective assistance of counsel, (2) the trial court erred in its jury instructions, and (3) the trial court erred by failing to intervene *ex mero motu* in the State's closing argument. For the reasons discussed below, we disagree.

## I. **Facts and Procedural Background**

At first, the night of 21 December 2018 was as most nights were for Defendant—uneventful. After getting off work, he met his friend Marcus Walton

("Walton") at Defendant's cousin's house where together they drank bourbon, played Spades, and talked about the possibility of going to see a street race later that evening. Around 9:00 p.m., Walton received a call from Dominique Hathaway ("Hathaway") who informed Defendant and Walton that their barber was going on break until after Christmas, so if they wanted to get their hair cut, they would have to go that evening. Upon hearing this news, Walton and Defendant finished their drinks and headed over to get their hair cut by their barber at his in-home barbershop. Upon arrival, Defendant crossed paths with Isaac Jermaine Hawk ("Hawk"), who was on his way out of the barbershop. Defendant and Hawk had a contentious relationship, dating back to when they were teenagers; so, when Hawk appeared friendly towards Defendant, it took Defendant by surprise. Defendant asked Hawk if the two could speak outside, and Hawk agreed. The two spoke about comments Hawk had allegedly made about the baby Defendant and his girlfriend recently had together—implying Hawk, not Defendant, was the father. Hawk denied making the comments, and the conversation ended in a handshake.

After leaving, Hawk went to the home of Rashawn Goodman ("Goodman"), where a few other people including Aaron Eason ("Eason") had gathered. While there, Hawk told Eason about the conversation he had just had with Defendant, calling it "an argument." After about an hour or two, Eason and Hawk left Goodman's home in separate cars, both driving to Hawk's residence. While on the way to Hawk's residence, Eason began receiving several phone calls from blocked numbers. After

five or so calls, Eason answered the phone and recognized the voice of the caller to be Hathaway, who asked to speak with Hawk. Eason explained he was not with Hawk, and the conversation ended.

Upon arrival at Hawk's residence, Eason received another call, this time from Defendant. Eason passed the phone to Hawk, who spoke with Defendant for approximately two minutes. After the conversation ended, Hawk changed out of flip flops and into tennis shoes then reported that Defendant was on his way over.

A few minutes later, a car driven by Hathaway pulled into Hawk's driveway, and Defendant emerged from the back-passenger seat. Defendant walked up the driveway towards Hawk, and the two began arguing face-to-face with each other. As the two argued, they began walking back down the driveway, towards Hathaway's car, with Defendant walking backwards. After about three to five minutes of arguing, a fist-fight broke out between Defendant and Hawk in which both men landed a few blows. Due to it being dark outside, witnesses could not tell who swung the first punch.

After a few minutes of fighting, Defendant continued walking backwards away from Hawk, while Hawk, with his hands up, continued to walk towards Defendant. At that point, Defendant pulled out a gun and began shooting Hawk. Hawk was shot five times and died in his driveway. Before first responders arrived, Defendant, Hathaway, and Walton fled the scene.

A short distance from Hawk's residence, Hathaway wrecked his car. At this

point, Defendant got out, threw his gun in the woods, and started walking through the night towards Virginia.

Meanwhile, responding to the emergency call, Deputy David Adkins ("Deputy Adkins") began traveling towards Hawk's residence. On his way, he noticed Hathaway and Walton standing on the side of the road after having wrecked their vehicle. After checking in at the scene of the shooting at Hawk's residence, Deputy Adkins doubled back to check on Hathaway and Walton, each of whom was observed to be uninjured and unharmed.

Approximately four hours after the shooting, a law enforcement officer found Defendant walking on the side of the road and detained him. A search of Defendant revealed no weapon, and while he did smell of alcohol, Defendant showed no signs of impairment and only some minor scratches on his palms.

## II. **Jurisdiction**

Appeal to this Court lies of right from the final judgment of a superior court. N.C. Gen. Stat. § 7A-27(b) (2021).

## III. **Analysis**

Defendant raises several issues on appeal, all of which arise from the proceedings of his trial, which took place between 18 and 21 July 2022. Defendant contends that, during his trial, he received ineffective assistance of counsel, and the trial court erred in both its jury instructions and by failing to intervene *ex mero motu* during the State's closing arguments.

## A. Ineffective Assistance of Counsel

To begin, Defendant asserts he received ineffective assistance of counsel ("IAC") when his attorney (1) conceded Defendant's guilt prior to obtaining Defendant's consent, and (2) undermined Defendant's testimony during closing arguments. Upon review, we hold these arguments lack merit and accordingly, conclude there was no IAC.

Whether a defendant received IAC at trial is a question of law reviewable *de novo*. *State v. Wilson*, 236 N.C. App. 472, 475, 762 S.E.2d 894, 896 (2014). "Under a *de novo* review, [this] [C]ourt considers the matter anew and freely substitutes its own judgment for that of the lower tribunal." *State v. Biber*, 365 N.C. 162, 168, 712 S.E.2d 874, 878 (2011) (citation omitted).

To prevail on his IAC claim, Defendant must first "show that counsel's performance was deficient[,]" which requires a showing that counsel "made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." *Strickland v. Washington*, 466 U.S. 668, 687, 104 S. Ct. 2052, 2064, 80 L. Ed. 2d 674, 688 (1984). Next, Defendant must show "that the deficient performance prejudiced the defense[,]" which requires a showing that "counsel's errors were so serious as to deprive the defendant of a fair trial whose result is reliable." *Id*. at 687, 104 S. Ct. at 2064, 80 L. Ed. 2d at 688.

### 1. Conceding Guilt Without Prior Informed Consent

In his first IAC claim, Defendant contends he is entitled to a new trial because his counsel "conceded his guilt without first obtaining his express, informed consent."

It is per se prejudicial error for counsel to concede a defendant's guilt without obtaining prior consent. *State v. Harbison*, 315 N.C. 175, 180, 337 S.E.2d 504, 507 (1985). In addition to an explicit admission of guilt, an "implied admission of guilt can, in fact, constitute a *Harbison* error." *State v. McAllister*, 375 N.C. 455, 475, 847 S.E.2d 711, 723 (2020). Counsel may, however, without consent, remind the jury it could find the defendant guilty of a lesser-included offense, if any, if it does not find defendant guilty of the charged offense. *State v. Campbell*, 359 N.C. 644, 696, 617 S.E.2d 1, 33 (2005).

Here, Defendant claims his counsel violated *Harbison* when he conceded or implied Defendant's guilt during closing arguments without Defendant's consent. In *Harbison*, the defendant was convicted of second-degree murder and assault with a deadly weapon following a closing argument from his counsel in which counsel stated, "I have my opinion as to what happened on that April night, and I don't feel that [defendant] should be found innocent." *Harbison*, 315 N.C. at 177-78, 337 S.E.2d at 506. The *Harbison* court held defense counsel's closing argument was per se prejudicial error because, "[w]hen counsel admits his client's guilt without first obtaining the client's consent, the client's rights to a fair trial and to put the State to the burden of proof are completely swept away." *Id.* at 180, 337 S.E.2d at 507.

Here, Defendant draws this Court's attention to certain statements made by defense counsel to bolster his argument that defense counsel conceded guilt without Defendant's prior consent. Defendant's counsel's statements read, in relevant part:

> Now was his use of force excessive? That is a jury question. I will come back to that in a minute. If you find that to be excessive, that is manslaughter. That's voluntary manslaughter. If you find the use of force to be excessive, that is voluntary manslaughter.
> . . . .
>
> Was the use of force excessive under the circumstances? Consider all things that were happening, consider he is going 116 feet backwards. You decide whether the use of force is excessive. But if it was excessive, that is voluntary manslaughter. That is not first degree murder. That is not second degree murder. That is voluntary manslaughter.

A *de novo* review of the Record, however, reveals Defendant's counsel neither stated nor implied Defendant's guilt. These statements made by Defendant's counsel are more akin to the statements made by defense counsel in *Campbell*, where counsel for the defendant pointed out to the jury that the element of specific intent was the only difference between first and second-degree murder; thus, without specific intent, the most serious crime the defendant could be convicted of was second-degree murder. *See Campbell*, 359 N.C. at 696, 617 S.E.2d at 33. Our Supreme Court held counsel's statements to the jury regarding specific intent did not constitute IAC.

Here, Defendant was charged with first-degree murder, and the transcript reveals his counsel advocating for the jury to find Defendant either not guilty, or

guilty of voluntary manslaughter. Under *Campbell*, those statements did not render his assistance ineffective. Further, because our review of the Record reveals that Defendant's counsel neither stated nor implied Defendant's guilt, the inquiry under *Harbison* of whether or not Defendant's consent was obtained is rendered moot. *See Harbison*, 315 N.C. at 180, 337 S.E.2d at 507. Finally, nothing in our review of the Record indicates Defendant's counsel was deficient such that he was deprived a fair trial. *See Strickland*, 466 U.S. at 687, 104 S. Ct. 2064, 80 L. Ed. 2d at 688. For those reasons, we hold there was no IAC pertaining to Defendant's first claim.

2. Undermining Defendant's Testimony in Closing Arguments

In his second IAC claim, Defendant argues his counsel rendered "ineffective assistance by directly undermining [Defendant's] testimony in closing argument."

To prevail on an IAC claim for statements made during closing arguments, a defendant has the burden of showing their counsel's statements were incoherent and failed to negate the elements of the crime for which they were charged. *State v. Moore*, 286 N.C. App. 341, 351, 880 S.E.2d 710, 717 (2022). When closing arguments fail to provide any positive advocacy, however, then counsel can be considered ineffective. *State v. Davidson*, 77 N.C. App. 540, 545-46, 335 S.E.2d 518, 521–22 (1985).

Here, Defendant specifically contends he received IAC when, during closing arguments, his counsel directly contradicted Defendant's own testimony. The statements made by defense counsel, however, do not rise to the level of being

"incoherent" or lacking of any "positive advocacy." *See Moore*, 286 N.C. App. at 351, 880 S.E.2d at 717; *see also Davidson*, 77 N.C. App. at 545-46, 335 S.E.2d at 521–22. For example, Defendant points to the fact that, in his own testimony, he claims to have fallen asleep in Hathaway's car, then woke up to realize he was at Hawk's house; whereas, in closing arguments, defense counsel stated Defendant *intentionally* went to Hawk's house that evening.

> He went over to the house. He shouldn't have gone to the house. That was stupid. He went over to the house but he didn't go to kill nobody, he went over there to talk to him. Boys done pumped him up talking junk. He went there to finish the conversation. He ain't go over there to fight. That man ain't no fighter. Somebody done choked you out. He ain't over there to fight that man. He went over to talk, to finish the conversation.

> Things turned sour and this is where we are. There is no premeditation, there is no deliberations. There is no cool state of mind. You have two grown men fighting over a female and they are intoxicated. I can't say it enough.

Here, defense counsel's statement is far from incoherent or lacking positive advocacy. While it is true the statements seem to contradict Defendant's testimony that he had "dozed off" in the car and then woke up to find himself at Hawk's house, nothing else in the Record corroborates Defendant's statement. Additionally, in closing arguments, defense counsel actively worked to negate the elements of first-degree murder by stating:

> Now if it was premeditation and deliberation [Defendant] would have pulled the gun out and shot [Hawk] right then when he got out of the car.

> Let me ask you this, why would a man that wants to kill somebody talk to him?
>
> . . .
>
> So they talk, they have a conversation. And it gets heated. Five to eight minutes. Now why didn't [Defendant] shoot [Hawk]? Then Hawk, who doesn't take no junk, don't take no mess, putting his shoes on, ready to fight, he starts punching on [Defendant] right here. He starts punching on him. [Defendant] is over there to talk. [Defendant] told you. Ladies and gentlemen, if [Defendant] was over there to shoot that man, he would have shot him. There is no way in the world we could get around the fact this man retreated all the way to the end of that driveway and didn't even pull that trigger. You know he was asking for help. You know he was asking for help. There is no way in the world.

The statements made by defense counsel hardly rise to the level of being incoherent or ineffective. *See Moore*, 286 N.C. App. at 351, 880 S.E.2d at 717. Throughout his closing argument, defense counsel made several attempts to impress upon the jury that Defendant lacked the requisite intent to be found guilty of first-degree murder. Moreover, while it is true that counsel's account of how Defendant wound up at Hawk's house on the evening of 21 December differs from Defendant's own testimony, counsel's statements were not so serious as to deprive Defendant of a fair trial. *See Strickland*, 466 U.S. at 687, 104 S. Ct. at 2064, 80 L. Ed. 2d at 688. For those reasons, we hold there was no IAC pertaining to Defendant's second claim.

## B. Jury Instructions

Next, Defendant argues the trial court erred in failing to instruct the jury on stand your ground laws and by instructing the jury on the aggressor doctrine.

Decisions regarding the trial court's jury instructions are reviewed by this Court *de novo*. *State v. Jenkins*, 202 N.C. App. 291, 296, 688 S.E.2d 101, 105 (2010). When objections are made to the trial court's jury instruction, this Court reviews to determine whether an error was committed and whether a different result would have been reached but-for that error. N.C. Gen. Stat. § 15A-1443(a) (2021). Where counsel fails to object, however, this Court reviews for plain error. N.C. R. App. P. 10(a)(4). A plain error is one that is so grave, it results in a "miscarriage of justice or in the denial to appellant of a fair trial[.]" *State v. Odom*, 307 N.C. 655, 660, 300 S.E.2d 375, 378 (1983) (quoting *United States v. McCaskill*, 676 F.2d 995, 1002 (4th Cir. 1982)).

Defendant contends the trial court made two errors—the first in failing to instruct the jury on stand your ground rights under N.C. Gen. Stat. § 14.51-3 (2021), and the second when it instructed the jury on the aggressor doctrine. Counsel for Defendant did not object to either of the jury instructions, so we review for plain error. *See* N.C. R. App. P. 10(a)(4).

As stated above, a plain error constitutes a "miscarriage of justice" or denial of a fair trial. *See Odom*, 307 N.C. at 660, 300 S.E.2d at 378. Our *de novo* review of the Record reveals enough facts that jury instructions regarding the aggressor doctrine were warranted, and instructions on stand your ground laws were not. For example, the testimony indicating Defendant may have initiated the fight during a phone call with Hawk, prior to arriving at Hawk's residence, supports the trial court's decision

to instruct the jury on the aggressor doctrine. Further, instruction on stand your ground laws is only applicable in spaces where a person has lawful right to be; here, the only evidence supporting Defendant's contention that he had a lawful right to be at Hawk's residence was nebulous testimony about a street race potentially happening nearby. *See* N.C. Gen. Stat. § 14.51-3 ("A person is justified in the use of deadly force and does not have a duty to retreat in any place he or she has the lawful right to be if . . . he or she reasonably believes that such force is necessary to prevent imminent death or great bodily harm[.]").

Given those facts, this Court does not conclude that the instructions given to, or omitted from the jury, constitute a miscarriage of justice. *See Odom*, 307 N.C. at 660, 300 S.E.2d at 378. For that reason, we conclude there was no plain error in the trial court's jury instructions.

## C. *Ex Mero Motu* Intervention

Finally, Defendant asserts the trial court erred when it failed to intervene *ex mero motu* in the State's closing argument.

"When [a] defendant fails to object to an argument, this Court must determine if the argument 'was so grossly improper that the trial court erred in failing to intervene *ex mero motu*.'" *State v. Walters*, 357 N.C. 68, 101, 588 S.E.2d 344, 364 (2003) (quoting *State v. Barden*, 356 N.C. 316, 358, 572 S.E.2d 108, 135 (2002)). During closing arguments, counsel has "the right to inform the jury of the

punishment prescribed by law[.]" *State v. Walters*, 294 N.C. 311, 314, 240 S.E.2d 628, 630 (1978).

Defendant takes specific issue with the following statements made by the State during its closing argument:

> Did [Defendant] tell you the minimum punishment for second degree murder is 144 months? Did [Defendant] tell you the minimum punishment for voluntary manslaughter is 38 months? Less time than it took this case to come to trial is the minimum. Who doesn't think this case is serious? Who doesn't think this case is serious? Its just trying to invoke some sympathy or some pity for [Defendant], that's all it is about. That's why they just tell you the max. They don't tell you the minimum.

Defendant argues "[i]t was plainly and grossly improper for the [State] to argue that the jury should not convict [him] of voluntary manslaughter because the sentence he might receive would not be sufficiently severe." While suggesting that the minimum sentence would not be severe enough punishment might run afoul of the unspoken rules of courtroom etiquette, it is not, in fact, against the law. *Walters* tells us that counselors have the right to inform the jury of the punishments prescribed, and here, counsel for both Defendant and the State made clear what the minimum and maximum sentences could be. *See Walters*, 294 N.C. at 314, 240 S.E.2d at 630. For that reason, we conclude the trial court did not err when it failed to intervene during the State's closing argument.

## IV. **Conclusion**

After careful review, we conclude Defendant did not receive ineffective assistance of counsel and accordingly, we dismiss both of Defendant's ineffective assistance of counsel claims. Further, we conclude the trial court neither erred nor plainly erred by deciding to instruct the jury on the aggressor doctrine but not stand your ground laws. Finally, we hold the trial court did not err when it neglected to intervene in the State's closing argument.

NO ERROR.

Chief Judge STROUD and Judge STADING concur.